442 So.2d 1039 (1983)
Barbara SPRADLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 82-1641.
District Court of Appeal of Florida, Second District.
December 14, 1983.
*1040 Jerry Hill, Public Defender, and Karla J. Staker, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Theda James Davis, Asst. Atty. Gen., Tampa, for appellee.
HOBSON, Judge.
Barbara Spradley appeals a conviction and sentence for manslaughter. We reverse and remand.
At approximately 12:20 a.m. on February 7, 1981, Deputy Wayne Close of the Lee County Sheriff's Department entered a houseboat in Matlacha, Florida, in response to a report of a shooting incident. He observed the victim, James Munn, sitting by the kitchen table, and being cared for by Bill Russell, a neighbor, who was holding a towel over Munn's stomach. A .22 caliber handgun was lying on the table, and appellant was standing nearby. She was upset and inquired several times as to Munn's condition. Deputy Close asked Russell what had happened. Russell answered that Munn had been shot, and that he, *1041 Russell, had entered the houseboat after the shooting, picked up the gun from the floor, and placed it on the table. After summoning an ambulance, Deputy Close questioned appellant. She replied that Munn, with whom she had been living for about five years, had been out drinking heavily throughout the day and night. He arrived home and went to bed sometime after 10:00 p.m. She came home about 30 to 45 minutes later, looked in on the sleeping Munn, and went to the upper level of the houseboat to check on her two children: Teresa, a mildly retarded 10-year old; and Jimmy, a 7-year old. While watching television with the children upstairs, she heard Munn screaming from the kitchen. When she came downstairs, an argument ensued between them. The gun accidentally discharged while in Munn's possession when she tried to take it away from him.
At around 1:30 a.m., Deputy Close left the houseboat with appellant to transport her to the sheriff's department. On their way there, he advised her of her Miranda[1] rights. He told her that she was not under arrest, but was a suspect. He then asked her if she wished to add anything to her earlier statement. She answered "No," but did not request an attorney. He then ceased questioning her.
Deputy Close arrived with appellant at the sheriff's department between 2:00 a.m. and 2:15 a.m. Minutes later, he initiated a conversation with her about the incident while preparing a written report. He did not reread her the Miranda warnings before beginning this colloquy. She repeated essentially the same story which she had provided him previously at the houseboat. He noticed that she was upset and concerned about Munn's condition during this time. She asked him several questions about Munn's condition. Unbeknownst to both of them, Munn had died en route to the hospital.
At about 2:45 a.m., Deputy George Mitar met with appellant at his office. He informed her that he was conducting a general investigation of the incident. Shortly after 3:00 a.m., he apprised her of her Miranda rights. He then advised her that Munn had died, at which time she began to cry. After being allowed only a few minutes to try to compose herself and to drink a cup of coffee, she signed a waiver of rights form. After she signed the form, he interviewed her on tape from about 3:15 a.m. until 3:55 a.m. On this tape, she stated basically the same story which she had told Deputy Close twice before.
A short while later, Deputy Mitar requested to speak with appellant's children. Appellant was unaware at the time that her children had already been brought to the station pursuant to the orders of Deputy Mitar, who was cognizant not only of their youthful ages, but also of the daughter's mental handicap. She acceded to his request.
After speaking with the children, Deputy Mitar returned to appellant shortly before 6:00 a.m. He advised her that there were some discrepancies between her story and that of her children. When he reminded her of the form which she had signed, she told him that she wanted to tell him the truth, and that she had not done so yet. He thereupon conducted a second taped interview with her which lasted from about 6:00 a.m. until 6:20 a.m.
At the outset of this interview, appellant's son, who was waiting by himself in an adjoining, locked room, was heard calling for appellant and asking to be let out so that they could go home. Her son was then let out of the room. However, Deputy Mitar still made him wait in another room while he interviewed appellant.
Appellant told Deputy Mitar during this second taped discussion that, after awaking, Munn began yelling and cursing at her because she had taken some items, including his gun, out of his pants pockets. He also started cursing the daughter and making degrading comments about her ability and character. Appellant then retrieved the articles and placed them on the kitchen table. When Munn continued screaming at *1042 her, she picked up the gun, intending to scare him by shooting at the wall. However, when he attempted to grab the gun from her, it discharged, fatally wounding him.
Throughout the entire time in which she was at the station, appellant, who appeared to Deputy Mitar as though she had lost a loved one, had not been granted an opportunity to sleep, had not been allowed any food, and had not been allowed an opportunity to speak with her children, who were in their nightclothes and were scared and confused.
The trial court denied appellant's pretrial motion to suppress her custodial statements to Deputies Close and Mitar.
Appellant argues on appeal that her custodial statements to Deputies Close and Mitar should have been excluded from evidence at trial on the grounds that they were not freely and voluntarily given and that the officers did not "scrupulously honor" her right to remain silent, which she invoked in Deputy Close's squad car. We agree with both assertions.
Appellant unequivocally invoked her Fifth Amendment right to remain silent, but not her Fifth Amendment right to counsel,[2] by responding "No" when Deputy Close asked her in his squad car upon advising her of her Miranda rights whether she wished to make any statements in addition to those which she had made previously at the houseboat. A person in custody is afforded a lesser degree of protection from further questioning by law enforcement authorities if he invokes the right to remain silent, but not the right to counsel. The Eleventh Circuit Court of Appeals aptly summarized the distinction in United States v. Bosby, 675 F.2d 1174, 1181-82 (11th Cir.1982):
Although the assertion of either right mandates the immediate cessation of an interrogation, the particular right invoked has a differing impact on subsequent police conduct. [Citation omitted.] Upon assertion of his right to counsel, law enforcement officials cannot subject the defendant to further questioning until an attorney has been appointed for him and he has been accorded the opportunity to consult. [Citations omitted.] Thus a request for counsel acts as an absolute prohibition on the right of police to initiate questioning until an attorney has been appointed. No such proscription upon the right of police to resume questioning exists where a defendant asserts his right to remain silent. Instead, law enforcement officials are required to cease questioning the defendant but may resume the interrogation at some later time. [Citations omitted.]
In Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313, 321 (1975), the Supreme Court of the United States declared, paraphrasing from Miranda, that resolution of the question of the admissibility of statements obtained after a person in custody has invoked his right to remain silent depends upon whether his decision to assert his "right to cut off questioning" was "scrupulously honored."
In holding that no Miranda violation occurred in Mosley, the Court stated:
This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.
423 U.S. at 105-06, 96 S.Ct. at 327, 46 L.Ed.2d at 322.
*1043 The record before us does not support the trial court's apparent finding that the state carried its burden of proving that appellant's decision to assert her "right to cut off questioning" was "scrupulously honored" by Deputies Close and Mitar. Although Deputy Close immediately ceased questioning her in the squad car when she invoked her right to remain silent, he promptly resumed interrogating her upon their arrival at the station about 45 minutes later. Approximately one-half hour later, Deputy Mitar began interrogating her about the shooting incident. He readvised her of her Miranda rights and she supposedly voluntarily waived her rights shortly after being informed that her boyfriend had died. Three hours later, after speaking with appellant's children, Deputy Mitar resumed questioning her, at which time she incriminated herself. In short, the deputies persisted in attempts to wear down her resistance throughout the early morning hours during questioning about the incident. The sole fact that Deputy Mitar had readvised her of her Miranda rights just before she gave her initial taped statement does not, in our view, save the state on this issue.
Alternatively, the record does not corroborate the trial court's ruling that the state carried its burden of showing that appellant's second taped statement to Deputy Mitar was freely and voluntarily given under the totality of the circumstances. In sum, her taped confession was extracted from her only after she was placed in the coercive atmosphere of a station-house setting, was subjected to a barrage of questions during the pre-dawn hours, was advised that her boyfriend of five years had died, was not allowed to care for her confused and frightened children, was not afforded an opportunity to sleep, and was not permitted to eat.
Appellant also contends on appeal that the trial court erred by admitting into evidence over her objection 1) Munn's death certificate, which indicated that his death, though resulting from the gunshot wound, was caused by a "homicide," to the exclusion of the three other listed possible causes  "accident," "suicide," and "undetermined"; and 2) testimony of the medical examiner who conducted the autopsy and completed the certificate, Dr. Robert Schultz, regarding how he arrived at the conclusion that the death was not caused by an "accident." We agree with her that the certificate and this particular testimony should not have been allowed into evidence.
A medical examiner should not be permitted, over objection, to testify as an expert witness concerning a factual issue unless a sufficient predicate has been laid. Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975). Over appellant's objection, Dr. Schultz, a forensic pathologist, testified why he excluded "accident" as the cause of Munn's death, notwithstanding admissions by him that at the time he performed the autopsy he did not have any knowledge about either the shooting incident or the investigation surrounding the incident, and that he was told prior to completing the certificate that the shooting had not been an accident. He thus was not qualified to opine that Munn's death was not caused by an "accident."
In any event, by marking on the death certificate and testifying that Munn's demise was caused by a "homicide," not an "accident," Dr. Schultz effectively eliminated appellant's viable defense of excusable homicide, thereby implying in very clear terms for the jury that appellant was guilty of one of the degrees of homicide. A witness, however, cannot offer an opinion as to the guilt or innocence of an accused person. Gibbs v. State, 193 So.2d 460 (Fla. 2d DCA 1967); Farley v. State, 324 So.2d 662 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 1184 (Fla. 1976).
Accordingly, we reverse the conviction and sentence for manslaughter and remand for proceedings not inconsistent with this opinion.
REVERSED and REMANDED.
OTT, C.J., and RYDER, J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The right to counsel during custodial interrogation is founded in the Fifth Amendment to the federal constitution, not the Sixth Amendment. Edwards v. Arizona, 451 U.S. 477, 485-86, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386-87 (1981).