881 So.2d 1137 (2004)
Brent Robert HUCK, Appellant,
v.
STATE of Florida, Appellee.
No. 5D03-1906.
District Court of Appeal of Florida, Fifth District.
July 16, 2004.
Rehearing Denied September 20, 2004.
*1139 Gregory W. Eisenmenger and Robert R. Berry of Eisenmenger, Berry & Peters, Melbourne, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Kellie A. Nielan, Assistant *1140 Attorney General, Daytona Beach, for Appellee.
MONACO, J.
Brent Robert Huck appeals his convictions for the kidnapping and felony murder of his former girlfriend, Misty Morse. The felony murder is based on the kidnapping. While Mr. Huck raises numerous issues on appeal, we conclude that none merit reversal of his judgment and sentence, and therefore, we affirm. There are, however, a number of issues brought to our attention by Mr. Huck that warrant discussion.

I. FACTS.
There was no eyewitness to the murder. The State's case was based entirely on circumstantial evidence. Nevertheless, the evidence adduced both establishes each element of the offenses charged, and excludes each reasonable hypothesis of innocence advanced by Mr. Huck. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002); Orme v. State, 677 So.2d 258 (Fla.1996). In view of the finding of guilt by the jury, the description of the evidence that follows is given from the perspective of the State.
Shortly after midnight on July 20, 2000, the victim's mother heard the victim showering and drying her hair in preparation for going out. She later heard the victim's phone ring twice and heard her talking on the phone. The victim left the house, and told her mother that she would see her in the morning. The victim's mother left for work at about 3:00 a.m., and would never see her daughter alive again.
The records for the victim's cell phone reflected that on July 20 she received a two-minute call from Mr. Huck at 1:58 a.m., and a second one-minute call from Mr. Huck at 2:23 a.m. No other calls were successfully made to or from the victim's phone. Later on July 20, Bobby Cooper, who had recently started dating the victim, unsuccessfully tried on a number of occasions to reach her by cell phone. Her mother also tried, but failed to reach her on July 21.
On July 23, 2000, the nude body of the victim was found in the Indian River near the shoreline of a residence. The victim's hands and feet were bound together with white rope that bore an unusual double-diamond pattern. Two broken plastic bags were attached to her feet by a length of spline.[1] The victim had white duct tape on her head and neck. The medical examiner was unable to determine the exact time of death. Because of the condition of the body, he testified that the death could have occurred at any time between the early morning hours of July 20th and the time the body was found.
Mr. Huck, who was the former boyfriend of the victim, gave a taped statement to the police on July 26, 2000, that was eventually published to the jury. In summary, Mr. Huck said in his statement that he met the victim about a year and a half prior to her death. They dated for a while, but broke up because, according to Mr. Huck, the victim slept with his roommate. Although they were no longer a couple, Mr. Huck continued to have sex with the victim, most recently on July 11, 2000, nine days before she disappeared. Mr. Huck indicated that the victim did not have any unusual sex habits, and did not like atypical sex, including choking or similar activities, during sex. He confirmed that he spoke to her by phone in the early morning hours of July 20th. He had been drinking with friends earlier that night when he was told by a friend that the victim was telling people that she was *1141 pregnant with Mr. Huck's child. Mr. Huck's statement indicates that when he talked to her on the phone, he told her:
[L]ook, what the hell is going on? I saw you and your (sic) not pregnant, why do I keep hearing this, you have really ruined my life.
His recorded statement later explained:
AGENT: So, you bitched to her about the pregnancy?
MR. HUCK: Yeah  just that it was still coming up  flat out why  I have my girlfriend, I've been cheating on my girlfriend with her, and my girlfriend comes up spends the weekends on me  with me.
...
MR. HUCK: I told her, you know my girlfriend comes to town every weekend and we go out to the bars. I've been dating her over nine months, and this is not going to go, you know, if rumor of this gets out  this is not gonna go.
Mr. Huck related in his recorded statement that he was with his fiancee from 9:00 p.m. on July 21, until 7:00 a.m., July 24, 2000. He indicated later that he had returned to his home at about 2:00 a.m. on July 20th. He said he was told by a friend on the evening of July 24th that the victim had been murdered, but his friend did not tell him how she was murdered. During the police interview, the investigator told Mr. Huck that the victim had been thrown in the river and had washed up on shore. After the interview concluded, the following conversation took place, according to the police investigator, in the investigator's car while they were traveling to one of Mr. Huck's residences:
A. I said if he was involved in her death  he could explain the death.
Q. What was his response when you said that to him?
A. There was a hesitation, and he said, "You can't explain a woman tied up and thrown in the river."
Q. Did he say anything else?
A. He paused and he said, "My position is I didn't do it."
Significantly, the police had not yet revealed to him that the victim had been tied up. It is noteworthy, however, that this incriminating statement was not contained in either the taped interview of Mr. Huck, or in any of the investigator's notes.
At the request of the Brevard County Sheriff's Office, Mr. Huck signed a consent form authorizing a search of his own house, as well as his parents' house. Mr. Huck lived from time to time at both locations. At Mr. Huck's parents' house an investigator recovered some black spline from a shelving unit in the garage. According to the officer, the spline was hanging down as if it had just been cut. He also recovered some white duct tape from Mr. Huck's bedroom. He testified that when he walked into the kitchen with the piece of tape, Mr. Huck's mouth dropped open. The investigator next recovered from the kitchen a tan plastic Publix bag with the words, "Baby Club," printed on it. Finally, the investigator recovered two hairs from the deck of a boat owned by Mr. Huck.
A few days later the police obtained a search warrant and searched both real properties and the boat again. The investigator found and retained a portion of matted hair from a fishing rod holder in Mr. Huck's boat. The investigator also seized some hairs for comparison purposes from a dog named Cheba that was owned by Mr. Huck. In addition, a diver for the Sheriff's Office recovered a small piece of rope with a red and white diamond pattern from the water near the seawall in the river near Mr. Huck's parents' house.
*1142 All of the evidence that was recovered was subjected to forensic testing. The plastic bags that were attached to the victim's body and the plastic bag seized from Mr. Huck's kitchen counter were all Publix bags with "Baby Club" printed on them. This variety of bag, of which about 3,000,000 were made, was in Publix stores for approximately three months from June through August of 2000. The bags bore quality control markers which showed when and where they were manufactured, and the specific operator who made them. The bags recovered from Mr. Huck's kitchen and the bags recovered from the victim's body were produced in the same lane, by the same employee, in the month of June, 2000.
The rope with the unusual double diamond pattern recovered from the victim's body and the rope found in the water in front of the Huck residence were consistent in all respects. Attempts to locate similar rope in the area were unsuccessful. An assistant manager of a local marine supply store testified that in his ten years in the business he had never before seen rope with that specific pattern. He said that he tried to locate the pattern through most of the U.S. manufacturers, but was not successful.
The white duct tape found on the victim was compared to the duct tape recovered from Mr. Huck's residence by a microanalyst with the Florida Department of Law Enforcement. He concluded that the two pieces of tape were of the same type and same grade, and were most probably made by the same manufacturer. He noted that only four to six per cent of the duct tape manufactured in the United States is white, but he was unable to match the tape to a specific manufacturer.
Another microanalyst with the Florida Department of Law Enforcement compared the spline that attached the bags to the victim's body to the spline seized from Mr. Huck's garage. She concluded that they were produced by the same manufacturer, in the same manufacturing plant, and on the same extrusion line.
An expert in DNA testing testified concerning the two hairs found on Mr. Huck's boat. The hairs were about 33 centimeters and 15 centimeters in length. The expert indicated that he examined the mitochondrial DNA of the hairs because the more specific nuclear DNA cannot be tested in hair. Mitochondrial DNA is maternally inherited, and therefore is not unique to a specific individual. Thus, for example, all brothers and sisters would have the same mitochondrial DNA profile because they would have inherited it from their common mother. Nevertheless, according to the testimony, the hairs from the boat matched the mitochondrial DNA of muscle tissue from the victim. He concluded that only about 1 in 51 Caucasians (or less than 2 percent), would have this same mitochondrial profile.
A trace evidence examiner with the Federal Bureau of Investigation microscopically compared samples of the victim's hair with hair seized from Mr. Huck's boat and vehicles. The samples showed the same microscopic characteristics, and were noteworthy because there was artificial treatment on the majority of the hair. The victim had colored her hair on the day before she disappeared.
The same trace evidence examiner also compared dog hairs that were found on the rope and tape that was used to bind the victim's body with samples of hair taken from Cheba, Mr. Huck's Rottweiler-mix dog. Because dog hair does not have as many differentiating features as human hair, the witness could say only that the hair recovered from the tape and rope bore the same characteristics as Cheba or a similar breed. However, a DNA expert *1143 who carried out mitochondrial DNA testing on the recovered hairs was able to say that they had the same mitochondrial sequence as the hairs taken from Cheba. That same mitochondrial sequence is, however, found in approximately ten percent of all dogs.
An investigator testified that the shortest water route to the Indian River where the body was found from Mr. Huck's residence is to travel south from the residence under the Mathers Bridge and into the river. The Mathers Bridge is a swing bridge, and the clearance under it ranges from six feet to seven feet, six inches, depending on the water level. When the police investigators examined Mr. Huck's boat, they noticed that a boat light had been broken off. The point of impact was about seven feet, six inches above the water line. Mr. Huck's explanation was that he broke off the light several months earlier when he maneuvered his boat under the Mathers Bridge while returning home from a bar.
At trial the medical examiner testified that because of the condition of the body, he was not "one hundred percent" certain of the cause of death. In his opinion, however, the victim died "within a reasonable degree of probability" from asphyxia either by the tape on her nose and mouth or from drowning. The medical examiner found no fractures, entrance or exit wounds, or injuries from a sharp object, but could not rule out blunt force trauma. He found no evidence of organ injury or disease in the lungs, and found no drugs, poisons or heavy metals. According to the doctor, the victim looked to be a normal 22-year old woman. He concluded that the manner of death was homicide.
It is with this factual background that we consider the issues raised by Mr. Huck that we believe merit discussion.

II. THE KIDNAPPING.
Mr. Huck argues that the trial court erred in denying his motion for judgment of acquittal on a number of grounds, including that the State failed to present prima facie evidence of kidnapping. This is, of course, of critical importance because the kidnapping was also the foundation for the felony murder count. Mr. Huck argues that there was no evidence that the victim "did not consent to bondage sex acts ... no evidence of ligature wounds... no evidence that [the victim] was confined or imprisoned against her will ... no evidence to determine whether [the victim] was bound ante-mortem or post-mortem."
In Gore v. State, 599 So.2d 978, 984 (Fla.), cert. denied, 506 U.S. 1003, 113 S.Ct. 610, 121 L.Ed.2d 545 (1992), the Florida Supreme Court upheld a kidnapping conviction despite evidence that the victim voluntarily left with the defendant. In doing so, the court stated:
However, other evidence indicated that at some point Roark's accompaniment of Gore ceased to be voluntary. Roark planned to return to her friend's home to spend the night. She called her grandmother that evening and told her she would be home in time for church the next morning. When her body was found in Florida, there was a shoestring tied around her wrist, suggesting that at some point she had been bound. Although there is conflicting evidence on this issue, factual conflicts are to be resolved by the jury. State v. Smith, 249 So.2d 16, 18 (Fla.1971). We find that there was substantial, competent evidence to support the jury's verdict of guilt as to the kidnapping charge, and we therefore reject Gore's argument that the trial judge should have granted his motion for acquittal.
The body of the victim in Gore was badly decomposed, after having been *1144 dumped in an illegal refuse area anywhere from two weeks to six months prior to discovery. The pathologist concluded that the cause of death was homicide, given the situation in which the body was found, and the fact that the neck area was completely missing.
The evidence of kidnapping in the present case is substantially more compelling than in Gore. The view of this evidence by the trial judge in considering a motion for judgment of acquittal must, of course, be taken in the light most favorable to the State. The State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence. Rather, it is the State's obligation to introduce competent substantial evidence that is inconsistent with the defendant's theory of events. Perry v. State, 801 So.2d 78, 84 (Fla.2001); State v. Law, 559 So.2d 187, 189 (Fla.1989).
Here, the victim told her mother that she would see her in the morning, but did not return to her home. She told Bobby Cooper, the person she had recently started to date, that she would see him the next day, but did not. Her body was found taped and bound with rope. Tape apparently covered her mouth and eyes. Ruptured plastic bags were attached to the body by spline, creating a reasonable inference that she was weighted down in the water.
Generally, with respect to a motion for judgment of acquittal, "[t]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, [an appellate court] will not reverse." Law, 559 So.2d at 188; see also Conahan v. State, 844 So.2d 629, 634-35 (Fla.), cert. denied, ___ U.S. ___, 124 S.Ct. 240, 157 L.Ed.2d 172 (2003). As there was substantial, competent evidence to support the jury's verdict of guilt in this regard, we cannot say that the denial of the motion for judgment of acquittal was erroneous.

III. MOTIONS FOR JUDGMENT OF ACQUITTAL BASED ON CIRCUMSTANTIAL NATURE OF THE STATE'S CASE.
Mr. Huck points out in his brief that the case against him was entirely circumstantial. At the appropriate points in the trial the defense moved, accordingly, for a judgment of acquittal on all counts, urging that the State failed to exclude his reasonable hypotheses of innocence. The trial court denied the motions, and Mr. Huck argues that to do so was error.
A de novo standard of review is applied when reviewing a motion for judgment of acquittal on appeal. See Pagan, 830 So.2d at 803); Tibbs v. State, 397 So.2d 1120 (Fla.1981). An appellate court will generally not reverse a conviction that is supported by substantial, competent evidence. See Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, then there is sufficient evidence to sustain a conviction. See Banks v. State, 732 So.2d 1065 (Fla.1999).
When the State's case is wholly circumstantial, however, there must not only be sufficient evidence establishing each element of the offense, but the evidence must also be inconsistent with the defendant's reasonable hypothesis or hypotheses of innocence. See Pagan; Orme v. State, 677 So.2d 258 (Fla.1996). The function of the trial court when addressing a motion for judgment of acquittal in a *1145 case comprised solely of circumstantial evidence is "to determine whether there is a prima facie inconsistency between (a) the evidence, viewed in the light most favorable to the State and (b) the defense theory or theories." Orme, 677 So.2d at 262. The finding of the trial court in this regard is reversible on appeal only where unsupported by competent substantial evidence. Id. If there is such an inconsistency, then it is for the finder of fact to resolve whether the evidence proves the defendant's guilt. Thus, the appellate standard of review is not whether the evidence failed to exclude every reasonable hypothesis of innocence, but whether there was substantial competent evidence for a jury to so decide. Moore v. State, 790 So.2d 489, 490 (Fla. 5th DCA 2001).
Mr. Huck argues that he presented at least five reasonable hypotheses of innocence that the State failed to rebut. They were:
1) Morse (the victim) voluntarily came over to Huck's residence. Morse died of natural causes during consensual sex. Huck disposed of the body by taping the eyes and mouth shut, tying the body with rope and putting it in river so as not to reveal his sexual relationship with the victim.
2) A "client" engaged in sex acts with the victim (apparently referencing the fact that the victim was employed by a massage parlor). The victim died of natural causes during consensual sex. Her client disposed of the body by taping the eyes and mouth shut, tying body with rope and putting it in river so as not to reveal his sexual relationship with the victim. The hair evidence was the result of a secondary transfer and/or placed there at some earlier occasion.
3) A client engaged in consensual sex acts with the victim, including taping eyes and mouth shut, tying the body up with rope. The victim died of natural causes during consensual sex. Her client then disposed of the body by putting it in the river so as not to reveal his sexual relationship with the victim. The hair evidence was the result of a secondary transfer and/or placed there at some earlier occasion.
4) Bobby Cooper, the person the victim had recently started dating, engaged in sex acts with the victim. The victim died of natural causes during consensual sex. The boyfriend disposed of the body by taping her eyes and mouth shut, tying her body with rope and putting it in the river, so as not to get involved in the investigation into the victim's death. The hair evidence was the result of a secondary transfer and/or placed there at some earlier occasion. The boyfriend testified that he did not kill the victim, so there is some evidence excluding that construction. The boyfriend's testimony did not exclude the hypothesis that he disposed of the body after death by natural causes.
5) Underwood (or Woods, or Perez, or Myers)[[2]] picked up the victim for a date. He became enraged upon overhearing conversations with Mr. Huck regarding claims of pregnancy and killed the victim. He taped her eyes and mouth shut (either before or after killing). He tied up the victim (either before or after killing her) and placed her in the river. The hair evidence was the result of a secondary transfer and/or placed there at some earlier occasion.
The State responds generally arguing that these hypotheses are not reasonable and that they conflict with the State's evidence. We agree.
*1146 As to the first hypothesis, Mr. Huck alleges that the victim died of natural causes during consensual sex with him, and that he disposed of her body after she died. The evidence presented, however, was inconsistent with this theory. There was no physical evidence of sexual intercourse, and Mr. Huck told the police specifically that the last time he had sex with the victim was on July 11, 2000, or nine days before she disappeared. More importantly, the assertion that Mr. Huck taped the victim's eyes and mouth shut after she died is not particularly reasonable. The only logical reason to tape her eyes and mouth shut would have been to prevent her from seeing, talking, screaming for help, or breathing while she was alive. There is no logical or reasonable purpose for taping a person's eyes and mouth shut after she is dead. In addition, the State presented evidence inconsistent with death by natural causes. The medical examiner testified within a reasonable degree of medical probability that the cause of death was asphyxia and the manner of death was a homicide.
As to the second hypothesis, there was evidence inconsistent with death by natural causes, and as noted above, taping the eyes and mouth after death is not reasonable. Additionally, there was no evidence that the victim was with a "client," or that the victim was a prostitute. On the contrary, there was evidence that the victim was with Mr. Huck, and that Mr. Huck killed her. More specifically, Mr. Huck was the last person known to speak to the victim during the early morning hours of July 20. Her hair was found on his boat and in his vehicles. The rope, tape, spline and Publix bags found attached to the victim's body all matched rope, tape, spline and bags found in Mr. Huck's possession. The dog hairs found on the tape matched the hairs on Mr. Huck's dog. The hairs found on Mr. Huck's boat were consistent with the victim's hair. In addition, Mr. Huck had motive and opportunity. As he said himself, he was upset with the victim for claiming to be pregnant with his child, and did not want his fiancee to find out about either his ongoing sexual relationship with the victim, or her alleged pregnancy. Moreover, by his own statement, he was home alone when he called the victim and for many hours thereafter, and accordingly had no alibi. In short, the State presented sufficient testimony to show that Mr. Huck killed the victim. There was no evidence to support Mr. Huck's hypothesis that a client killed the victim.
The third hypothesis of innocence suffers the same fate. Mr. Huck alleges that a client taped and bound the victim during consensual sex. Once again, there was no evidence presented to show that the victim either had a client, or was with a client, or had sexual intercourse before her death. Even if there had been evidence to support this hypothesis, it is hardly plausible. As the medical examiner testified, taping the eyes and mouth, tying the hands and legs and weighting the body all point to kidnapping and homicide, and are inconsistent with consensual sex and death by natural causes. In addition, the medical examiner specifically ruled out death by natural causes. Finally, Mr. Huck told the law enforcement authorities that the victim did not like any sexual activity rougher than pulling her hair from behind, and did not have any unusual sexual habits. More particularly, he told the police that she did not like being choked during sex. These statements are inconsistent with the hypothesis that the victim voluntarily participated in sexual bondage.
As for the fourth hypothesis, Mr. Huck alleges that Bobby Cooper, the person she had started dating shortly before her death, had sex with the victim, the victim *1147 died of natural causes during sex, and Mr. Cooper disposed of the body. Mr. Cooper, however, denied killing, tying up, or taping the victim, and there was no evidence that Bobby Cooper was with the victim, or had sex with her the night she disappeared. The only evidence tying Mr. Cooper to the victim was the fact that they had recently started dating, and that he had possession of her driver's license after she was found. Mr. Cooper testified that he and the victim had gone out a few days before her death, and that she asked him to carry her driver's license because she did not have pockets. On the following day Mr. Cooper realized he still had her driver's license. He called the victim and advised her of this fact. She told him to hold onto it, as they were planning to see each other again in a day or two. Mr. Cooper tried calling the victim several times on the day she disappeared and on the following day, but could not reach her. This evidence is obviously inconsistent with Mr. Huck's fourth hypothesis.
Finally, we come to the fifth hypothesis. Mr. Huck asserts that one of four friends (Mr. Underwood, Mr. Woods, Mr. Perez or Mr. Myers), picked up the victim for a date, became enraged upon overhearing the victim's telephone conversations with Mr. Huck about being pregnant and murdered the victim. There is simply no evidence that the victim was with any of these particular persons on the night she disappeared. However, there was evidence to show that Mr. Huck spoke twice to the victim on the phone that night, and the victim's body was found with rope, tape, spline, Publix bags and dog hairs consistent with those found in Mr. Huck's possession. Moreover, there is no evidence to support Mr. Huck's assertion that the victim's alleged date became enraged and killed her after overhearing her phone conversations with Mr. Huck in which she allegedly told Mr. Huck that she was pregnant. As with the other hypotheses, this assertion is simply unsupported, speculative and unreasonable.
In support of his position, Mr. Huck brings to our attention the following passage from Golden v. State, 629 So.2d 109, 111 (Fla.1993):
The finger of suspicion points heavily at Golden. A reasonable juror could conclude that he more likely than not caused his wife's death. In criminal cases, however, circumstantial evidence must establish that death was caused by the criminal agency of another beyond a reasonable doubt, which is a more demanding finding than that it likely occurred. We conclude that the state's circumstantial evidence is insufficient to meet this test and to overcome Golden's hypothesis that his wife's drowning resulted from an accident. There were no eyewitnesses to the death, and Golden never confessed or made anything but exculpatory statements. There was no evidence that relations between the Goldens were anything but affectionate and cordial. There were no wounds or other signs of violence on the body. There was no proof to support the state's theory that he pushed her off the dock into the water. Thus, the state failed to prove beyond a reasonable doubt that Mrs. Golden's death resulted from the criminal agency of another person rather than from an accident.
Mr. Huck argues by analogy that the State's failure to present evidence inconsistent with the hypothesis that the decedent's drowning death was accidental in Golden is similar to the evidence presented by the State in the present case. As noted above, however, an analysis of the evidence adduced at trial shows otherwise. While no single piece of evidence is conclusive, the cumulation of all of the evidence *1148 points with great persuasive strength to guilt. Moreover, Golden is quite distinguishable. In Golden, the medical examiner testified that the victim drowned. There was no evidence of foul play and nothing to indicate the death was anything other than an accident. In the instant case, the jury was presented with sufficient evidence to conclude that Mr. Huck killed the victim. The medical examiner concluded that the victim died from asphyxiation, or suffocation, either by drowning, taping the mouth and nose or manually preventing her from breathing. He also concluded that the manner in which her body was found, being bound, taped and weighted down, pointed to a homicide and not an accident or death by natural causes. Accordingly, we conclude that the trial court correctly denied the motions for judgment of acquittal because the State presented prima facie evidence of the crimes that was inconsistent with Mr. Huck's hypotheses of innocence.

IV. THE MEDICAL EXAMINER'S OPINIONS
Mr. Huck argues that the trial court erred in allowing the medical examiner to testify about the cause and manner of the death for a number of reasons. Although we find no error in allowing the medical examiner to testify as he did, we examine three of Mr. Huck's arguments with greater specificity. Mr. Huck argues first that the opinions of the medical examiner were not based upon his specialized experience, but instead were based on facts within the ordinary experience of the jury. He next posits that there was an insufficient predicate to allow the medical examiner to pick one cause of death over another. Finally, he asserts that the medical examiner should not have been permitted to testify as to the cause of death because he could only render opinions based upon a reasonable degree of medical probability, not medical certainty.
In connection with his first argument to the effect that the medical examiner's opinions were not expert opinions at all, Mr. Huck relies on Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975). That case unquestionably holds that an expert should not be allowed to give conclusions based on facts that are within the ordinary experience of the members of the jury. We, of course, agree with that statement of the law. It just does not apply to this case.
Mr. Huck claims that the condition of the victim's body when it was discovered was not disputed, and that the jury, within its ordinary experience, could have reached the very same conclusion as the medical examiner based on the fact that the victim's body was found nude, bound and taped after having washed ashore in the river. The medical examiner's conclusions, however, were based on more than simply the condition of the victim's body when it was found. The medical examiner ruled out death by accident or natural causes after performing a full autopsy on the victim. He found no evidence of disease, trauma, drugs or poison. He ruled out death by natural causes partly on the basis of the victim's age, health and medical history and partly on his autopsy findings. Thus, the medical examiner's conclusions in the instant case were most assuredly based partly on facts outside the ordinary experience of the jury and were, therefore, admissible under section 90.105, Florida Statutes (2003).
The determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision in that regard will not be reversed absent a clear showing of error. See Anderson v. State, *1149 863 So.2d 169, 179 (Fla.2003). Section 90.702, Florida Statutes, requires that before an expert may render an opinion, two preliminary factual determinations must be made by the court under section 90.105, Florida Statutes. First, the court must determine whether the subject matter will assist the trier of fact in understanding the evidence or in determining a fact in issue. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter. Id. Here, both requirements of section 90.105 were fully satisfied with respect to the testimony of the medical examiner.
Although Mr. Huck concedes that asphyxia was a possible cause of death based on the evidence, his second argument regarding the admission of the testimony of the medical examiner is that there was an insufficient predicate for the medical examiner to pick one cause of death over another. Mr. Huck focuses on the fact that the medical examiner could not rule out various medical causes of death, such as heart block, thrombosis, pulmonary clotting, coronary artery spasm, congestive heart failure and others.
As authority for this argument, Mr. Huck cites Spradley v. State, 442 So.2d 1039 (Fla. 2d DCA 1983). In Spradley, the medical examiner was permitted to testify that the victim's death was not an accident, despite his admission that he did not have any knowledge about the shooting incident or the investigation of the incident. The case before us is clearly distinguishable. The medical examiner in the present case testified that to determine the cause of death, it is critical to learn the circumstances in which the body is discovered, and he did just that. To pick the most obvious example, the fact that the body was found washed ashore in the river was a circumstance that the medical examiner learned that helped to lead him to conclude that the victim may have been drowned. In addition to the circumstances in which the body was discovered, the medical examiner personally observed the external condition of the victim's body, noting that the legs and arms were bound, the eyes were taped and the neck contained tape around it that had probably slipped down from being around the mouth. Connected to the body by spline were ruptured plastic bags, giving rise to a reasonable inference that the body had been weighted down in the water. These observations supported his conclusions, and provided a sufficient predicate to render his opinions regarding the cause and manner of death. Moreover, the medical examiner testified in detail about his internal examination of the victim's brain, heart and abdominal areas. He observed no evidence of any disease or condition that would support a medical cause of death. When asked about specific medical causes on cross-examination, the medical examiner conceded that such causes, undetectable by autopsy, were possible but not likely, given the victim's age, health and lack of medical history. For example, the medical examiner noted that the autopsy revealed evidence of tongue biting, which is common in many autopsies. If there is a history of seizure disorder, the tongue biting may be indicative of a seizure or stroke. If there is no history, that link cannot be made. In this case, both the fact that there was no history of seizure disorder, and the victim's young age militated against stroke as a cause of death.
A medical expert may properly render an opinion as to cause of death by process of elimination. See Eierle v. State, 358 So.2d 1160 (Fla. 3d DCA 1978). The Third District Court's analysis in Eierle is instructive:
As to the admissibility of the medical examiner's testimony, a review of the *1150 record shows that the witness was a qualified pathologist, that he conducted a thorough autopsy on the deceased's body, and that by a process of elimination he concluded, based on a reasonable medical certainty, that the deceased had died from suffocation or strangulation. He found no evidence of disease, trauma to the body, obstruction to the throat, drugs, insect or snake bites. He did state on cross-examination that he regarded his opinion as a "guess", but he clarified this testimony on redirect examination by stating that this was his opinion based on a reasonable medical certainty.
A medical witness may reach a conclusion by the process of elimination through excluding natural causes of death. This process of elimination will not render the witness' conclusion inadmissible, but merely affects the weight to be given his testimony which must be determined by the jury. Vaillancourt v. State, 288 So.2d 216 (Fla.1974).
Id. at 1161.
We agree that there is nothing inherently wrong with coming to a conclusion by use of the process of elimination, and we find no error in the trial court's determination to allow the medical examiner to testify on that basis. The weight to be given to such testimony and its believability are for the jury to decide.
Mr. Huck also argues that it was improper for the medical examiner to offer his opinions based on a reasonable degree of medical probability, instead of a reasonable degree of medical certainty. No authority is cited for this proposition, nor have we independently located any. In fact, the law in Florida contradicts this assertion. The Florida Supreme Court has held that "expert medical testimony as to the cause of death need not be stated with reasonable certainty in a homicide prosecution and is competent if the expert can show that, in his opinion, the occurrence could cause death or that the occurrence might have or probably did cause death." Buenoano v. State, 527 So.2d 194, 197-98 (Fla.1988); see also Butts v. State, 733 So.2d 1097, 1101 (Fla. 1st DCA 1999).
Accordingly, we conclude that the trial court did not abuse its discretion in allowing the medical examiner to testify regarding the cause and manner of death of the victim.

V. THE CONTROLLED TELEPHONE CALL.
Michelle Dwyer was Mr. Huck's fiancee. Although their relationship had ended at one point because Mr. Huck had apparently lied to her about an ex-girlfriend, they had reconciled in early June of 2000. The police contacted Ms. Dwyer on July 28, 2000, and asked her to call Mr. Huck on the telephone while the police taped the conversation. She agreed to do so. The conversation was not terribly informative. When Ms. Dwyer asked about the murder victim, Mr. Huck replied that he was "not talking on the f phone," and hung up. Several other attempts resulted in about the same response. Audible on the tape is the police investigator's comment, "I don't want you to push him too far. Okay? Because I don't trust him as far as I can throw him."
The tape was offered into evidence over defense objections for relevancy. The defense objected, as well, after the officer's comment was played to the jury and moved for a mistrial. Curiously, although the defense was fully aware of the fact that the officer's comment was on the tape, it made no specific objection to the playing of that portion until after the comment was made known to the jury. The trial judge denied the motion for mistrial, but gave a curative instruction.
Mr. Huck argues on appeal that the trial court erred in admitting into evidence the *1151 tape recording of a controlled telephone call between Mr. Huck and his fiancee because it was both irrelevant, and its probative value was outweighed by the danger of unfair prejudice. The State, on the other hand, argues that the tape was relevant to show Mr. Huck's state of mind shortly after the murder, particularly where the State theorized that Mr. Huck murdered the victim so that she would not interfere with his relationship with his fiancee. We think Mr. Huck is correct.
Relevant evidence is that which tends to prove or disprove a material fact. See § 90.401, Fla. Stat. (2003). It is difficult to understand why Mr. Huck's state of mind a week after the murder was a material fact in this case. Perhaps the fact that Mr. Huck got angry when confronted about cheating with the victim is consistent with the State's theory that he was protective of the relationship with his fiancee, and has some minimal relevance, inasmuch as motive is generally a material fact. The probative value of this evidence, however, appears to us to be outweighed by the danger of unfair prejudice. Arguably, the primary thing the tape shows is that Mr. Huck could lose his temper with a woman. If so, it is improper character evidence. See § 90.404(1), Fla. Stat. (2003). While certainly the admission of evidence and the determination of its probative value is judged on an abuse of discretion standard, we think it was error to admit the tape. See State v. Gerry, 855 So.2d 157 (Fla. 5th DCA 2003).
The comment of the police officer to the effect that he did not trust Mr. Huck as far as he could throw him was likewise inadmissible. Two matters undercut the prejudicial nature of this comment, however. First, the court gave a curative instruction. See Stires v. State, 824 So.2d 943 (Fla. 5th DCA 2002); Henderson v. State, 789 So.2d 1016, 1018 (Fla. 2d DCA 2000); cf., Chamberlain v. State, 29 Fla. L. Weekly S305, S307 (Fla. June 17, 2004). More importantly, the defense fully admits that it knew of the comment before it was played to the jury, but never raised a specific objection to the playing of that part of the tape, or otherwise brought the comment to the attention of the trial court before it was played to the jury.[3] Instead, counsel only objected in advance of the playing of the tape on grounds of relevance and the prejudicial effect of showing Mr. Huck's anger. As a result, the trial judge was blind-sided. We think this smacks of invited error. See Terry, 668 So.2d at 962. If the defense did not feel compelled to raise this issue with the court before the cat was out of the bag so that the tape could have been redacted, then it should be satisfied with a curative instruction.[4]
Mr. Huck also asserts that the admission of the tape into evidence amounted to an improper comment on the exercise of his right to remain silent. The State suggests that there was no error because Mr. Huck was not in custody at the time he made the comments. See U.S. v. Rivera, 944 F.2d 1563, 1568 (11th Cir.1991). Regardless of the status of his custody, the position of the defense concerning the comment on the right to remain silent was, once again, not presented to the trial court prior to the admission of the tape into evidence, even though the defense was well aware of the contents of the tape before it was played to the jury. See Fruetel v. State, 638 So.2d 966, 972 (Fla. 4th DCA), review denied, 649 So.2d 233 (Fla.1994).
*1152 Finally, we consider whether the error in admitting the tape was harmless. See, e.g., Coley v. State, 816 So.2d 817, 818 (Fla. 2d DCA 2002). This trial lasted three weeks, and consumed 2,726 pages of transcript. There was no other mention of the tape, or the conversation, or the officer's unfortunate comment. The subject was not addressed by the State in its closing argument. It simply did not become a feature of the trial by any stretch of the imagination. We conclude beyond a reasonable doubt that the improperly admitted evidence did not affect the verdict. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986); see also Crumbley v. State, 876 So.2d 599 (Fla. 5th DCA 2004). Thus, while the admission of the tape was erroneous, it was not harmful.

VI. CONCLUSION.
Mr. Huck has raised numerous other points on appeal, including an attack on the consensual search and warrant search, none of which we deem to be meritorious. Accordingly, we affirm.
AFFIRMED.
GRIFFIN and PALMER, JJ., concur.
NOTES
[1] Black flexible rubber cord of the type used to install screens.
[2] These are the names of other acquaintances of the victim.
[3] See, e.g., Winn Dixie Stores, Inc. v. Merchant, 652 So.2d 1206 (Fla. 4th DCA 1995); § 90.104(1)(a), Fla. Stat. (2003).
[4] A party cannot make or invite error, and then take advantage of it on appeal. See Bennett v. Morales, 845 So.2d 1002 (Fla. 5th DCA 2003).