943 So.2d 976 (2006)
FLORIDA INSTITUTE FOR NEUROLOGIC REHABILITATION, INC., Appellant,
v.
Una MARSHALL and Russell Lieux, as co-personal representatives of the Estate of Michael Lieux, deceased, Appellees.
No. 2D05-2393.
District Court of Appeal of Florida, Second District.
December 8, 2006.
*978 Sylvia H. Walbolt, Robert E. Biasotti, and Christopher J. Kaiser of Carlton Fields, P.A., St. Petersburg, for Appellant.
Shea Moxon of Swope, Rodante P.A., Tampa, for Appellees.
CANADY, Judge.
The Florida Institute for Neurologic Rehabilitation, Inc. (FINR) appeals a judgment in a wrongful death case arising from the death of Michael Lieux (Lieux), who was a resident of FINR's facility in Hardee County for the long-term care of brain-injured individuals. Lieux's death occurred shortly after he was subdued and held in a prone position on the floor by FINR's employees who used a physical restraint technique called "therapeutic containment." In the wrongful death action brought by Lieux's parents, the appellees, Una Marshall and Russell Lieux, as co-personal representatives of their son's estate, the jury awarded damages of $2.5 million to each of Lieux's parents for their past mental pain and suffering sustained as a result of their son's death.[1] The jury rejected the parents' claim for punitive damages.
FINR raises several issues concerning evidentiary rulings of the trial court as grounds for reversing the judgment and ordering a new trial. First, FINR argues that the trial court erred in permitting the jury to consider evidence of the medical examiner's opinion that the manner of Lieux's death was homicide. Second, FINR argues that once the medical examiner's opinion that the death was a homicide had been admitted, the trial court erred in excluding testimony by law enforcement officials that Lieux's death was not a homicide. Third, FINR contends the trial court erred in permitting the plaintiffs to present certain evidence of FINR's alleged negligence at other times. Fourth, FINR contends that the trial court erred in excluding certain medical records regarding Lieux from other facilities where Lieux had been a resident.
In considering the issues raised by FINR, we apply an abuse of discretion standard. "Rulings on evidentiary matters generally are within the sound discretion of the trial court. Discretion is abused only where no reasonable person would view the matter as the trial court did." Ramirez v. State, 810 So.2d 836, 852 n. 51 (Fla.2001) (citation omitted). The trial court's exercise of discretion in admitting or excluding evidence "must be viewed in the context of the entire trial." Jimenez v. Gulf & W. Mfg. Co., 458 So.2d 58, 59 (Fla. 3d DCA 1984).
To prevail in its appeal, FINR must not only establish that the trial court abused its discretion but also show that the trial court's error was harmful. An appellate court may "set aside or reverse a judgment, or grant a new trial on the basis of [improperly] admitted or excluded evidence" *979 only "when a substantial right of the party [appealing] is adversely affected." § 90.104(1), Fla. Stat. (2006). In order for an appealing party to be successful in a challenge to a judgment based on "the improper admission or rejection of evidence," the appellate court must conclude "after an examination of the entire case . . . that the error complained of has resulted in a miscarriage of justice." § 59.041, Fla. Stat. (2006). In a civil case, an error is reversiblethat is, harmful errorwhere "it is reasonably probable that a result more favorable to the appellant would have been reached if the error had not been committed." Damico v. Lundberg, 379 So.2d 964, 965 (Fla. 2d DCA 1979).
We conclude that FINR has failed to establish that the trial court committed any error which requires reversal of the judgment. Without further comment, we reject FINR's third pointconcerning evidence of negligence at other timesand its fourth pointconcerning medical records from other facilitiesas grounds for reversal. For the reasons we explain below, we conclude with respect to FINR's first and second points that the trial court did not abuse its discretion either in allowing the introduction of evidence of the medical examiner's opinion concerning the manner of death or in excluding evidence of the opinion of law enforcement officials.

1. The Medical Examiner's Opinion that the Manner of Death was Homicide

Prior to trial, FINR filed a motion in limine seeking the exclusion of evidence concerning the medical examiner's opinion that the manner of Lieux's death was homicide. The trial court denied the motion.
At trial, evidence concerning the medical examiner's opinion was presented by way of the medical examiner's testimony and the introduction of the amended death certificate. The evidence concerning the medical examiner's opinion related not only to the manner of death but also to the cause of death.[2] No objection was made by FINR with respect to the evidence concerning the cause of death. According to both the amended death certificate and the medical examiner's testimony, the manner of Lieux's death was "[h]omicide" and the cause of his death was "[p]ositional asphyxia." In describing how the injury occurred, the amended death certificate stated: "Inappropriate restraining techniques."
FINR argued in its motion in limineas it does on appealthat the opinion evidence concerning the manner of death fell within the scope of section 90.403, Florida Statutes (2003), which provides that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, [or] misleading the jury." FINR cites Spradley v. State, 442 So.2d 1039 (Fla. 2d DCA 1983), for the proposition that "when a defense of accidental death is asserted, a medical examiner's testimony that the death was a `homicide' deprives the defendant of a fair trial." FINR further contends that "when the Polk County Medical Examiner testified that Lieux's death was a `homicide,' the case was essentially over." FINR's position on this issue is based on its assertion that "`[h]omicide' is a highly charged word that is commonly understood to mean that a crime has been committed." Thus, according to FINR, the admission of the *980 evidence of the medical examiner's opinion that the manner of Lieux's death was a homicide was likely to lead the jury to believe that FINRthrough its employeeshad committed a crime. FINR contends that "[b]y telling the jury the death was a `homicide,' [the medical examiner] told them that the death was not an `accident' as FINR claimed."[3]
In common parlance, homicide means "a killing of a human being through human agency." Webster's Third New International Dictionary 1083 (1993); see also 7 Oxford English Dictionary 332 (2d ed.1989) (defining homicide as "[t]he action, by a human being, of killing a human being"). The legal meaning of homicide is no different. "`The legal term for killing a [human being], whether lawfully or unlawfully, is "homicide." There is no crime of "homicide."'" Black's Law Dictionary 751 (8th ed.2004) (quoting Glanville Williams, Textbook of Criminal Law 204 (1978)). The existence of the legal categories of excusable homicide, see § 782.03, Fla. Stat. (2003), and justifiable homicide, see § 782.02; Fla. Std. Jury Instr. (Crim.) 7.1, makes clear that the term homicide does not denote criminality. The categories of justifiable and excusable homicide have long existed in the law. See William Blackstone, 4 Commentaries *177-78 ("Now homicide, or the killing any human creature, is of three kinds; justifiable, excusable, and felonious. The first has no share of guilt at all; the second, very little; but the third is the highest crime against the law of nature, that man is capable of committing."). It is thus well established in the lawas well as in common usage that homicide does not entail criminality.
It is thus also well establishedboth in common parlance and legal usagethat a homicide may be accidental. Indeed, a noncriminal homicide is noncriminal ordinarily because it is accidental. The human agency that precipitates the killing of a human being may be exercised by accident. "[B]y accident" is a central element in the definition of excusable homicide. § 782.03.
FINR's argument regarding the use of the term homicide exploits a difference between the broad meaning of the term accident in its common and legal usage and its narrower meaning in the terminology used by medical examiners for classifying the manner of death. In describing the manner of death, a medical examiner chooses from five distinct categories: natural, accident, suicide, homicide, or undetermined. It is inherent in this classification scheme that the different classifications are mutually exclusive. Under this scheme, the meaning of homicide is the same as it is in common and legal usage, while the meaning of accident is more restrictive than in common and legal usage.
The primary definition of accident is "[a]n unintended and unforeseen injurious occurrence." Black's Law Dictionary 15 (8th ed.2004). Under the manner of death classification system, the manner of death is by accident when the death results from such an injurious occurrence and no human agency other than the agency of the deceased is involved. Accidents thus fall into two subcategories: (1) occurrences involving no human agency; and (2) occurrences involving the unintentional agency of the deceased.
*981 If the death is through human agency whether intentional or by accidentof a person other than the deceased, it is classified a homicide. The fact that a death is placed in the homicide category does not indicate that the death was the product of an intentional act.[4]
Despite its well-established meaning, the term homicide certainly may be misunderstood as referring exclusively to deaths caused by a criminal actnamely, murder or manslaughter. See A Dictionary of Modern Legal Usage 406 (2d ed.1995) (stating that "homicide refers not to a crime (as is commonly thought), but to the lawful or unlawful killing of a person"); People v. Perry, 229 Ill.App.3d 29, 170 Ill.Dec. 823, 593 N.E.2d 712, 716 (1992) (recognizing that "opinion as to homicide" offered by forensic pathologist "might be construed as prejudicial, since a layperson might equate the word homicide with murder"). But the fact that the use of the term homicide carries with it some potential for misinterpretation does not mean that FINR has presented a persuasive argument regarding the medical examiner's opinion on the manner of death. The existence of some potential for misinterpretation of a particular word is not sufficient to require that a jury be precluded from seeing or hearing that word.
Under section 90.403, the potential for misinterpretation must create a "danger of unfair prejudice, confusion of issues, [or] misleading the jury" that "substantially outweigh[s]" the "probative value" of the evidence which has the potential for misinterpretation. "In applying the balancing test [under section 90.403], the trial court necessarily exercises its discretion." State v. McClain, 525 So.2d 420, 422 (Fla.1988). The trial court's determination will often require a careful consideration of the full context in which the disputed evidence would be evaluated by the jury. "`The court must weigh the proffered evidence against the other facts in the record and balance it against the strength of the reason for exclusion.'" Id. (quoting C. Ehrhardt, Florida Evidence § 403.1 at 100-03 (2d ed.1984)). "Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence." Id. (citing E. Cleary, McCormick on Evidence § 185 (3d ed.1984)).
FINR's argument relies on our decision in Spradley, a criminal case involving a charge of manslaughter. In Spradley, the defendant argued that the trial court had erred in admitting the victim's death certificate, "which indicated that his death, though resulting from [a] gunshot wound, was caused by a `homicide,' to the exclusion of three other listed possible causes `accident,' `suicide,' and `undetermined.'" 442 So.2d at 1043. The defendant also argued that the trial court erred in permitting the "testimony of the medical examiner . . . regarding how he arrived at the conclusion that the death was not caused by an `accident.'" Id. The Spradley court agreed with the defendant on both points and reversed the defendant's manslaughter conviction.
The Spradley court's decision on both points was based on two independent grounds. First, the court held that evidence of the medical examiner's opinion was inadmissible because a "sufficient predicate" had not been established for that opinion. Id. The court reasoned that the medical examiner had rendered the contested opinion despite the fact that "at the time he performed the autopsy he did not have any knowledge about either the shooting incident or the investigation surrounding *982 the incident." Id. Second, the court held that the medical examiner's opinion that the death was a homicide and not an accident "effectively eliminated appellant's viable defense of excusable homicide, thereby implying in very clear terms for the jury that the appellant was guilty of one of the degrees of homicide." Id. The court concluded that this was improper because "[a] witness . . . cannot offer an opinion as to the guilt or innocence of an accused person." Id. Although the Spradley opinion contains scant detail concerning the context of the opinion evidence, it is apparent from the court's discussion of this issue that the court understood the opinion that the death was caused by a homicide and not by an accident as clearly "implying" that the death had been caused by a criminal act.
The Spradley court's conclusion that an opinion concerning the defendant's guilt should have been excluded is consistent with the "basic proposition" stated by the supreme court in Martinez v. State, 761 So.2d 1074, 1079 (Fla.2000), "that a witness's opinion as to the guilt or innocence of the accused is not admissible" in a criminal proceeding. The Martinez court explained that although section 90.703, Florida Statutes (1997)which provides that opinion testimony regarding "an ultimate issue to be decided by the trier of fact" is not objectionable"would appear to allow opinion testimony of the defendant's guilt[,] . . . such testimony is precluded on the authority of section 90.403" because "its probative value is substantially outweighed by unfair prejudice to the defendant." Id.
Neither of the two rationales for the decision in Spradley provides a basis for reversal of the judgment against FINR. The first rationaleconcerning the predicate for the opinion evidencewas not presented by FINR as a basis for reversal. We acknowledge that the second rationaleconcerning the implication that a crime was committedmight be applied in a civil case. An opinion that a defendant in a civil case was guilty of a crime for the same conduct at issue in the civil case might raise a concern of unfair prejudice similar to the concern at issue in Spradley. But that rationale is inapplicable in the instant case because the context in which the opinion evidence was presented made clear that the classification of Lieux's death as a homicide implied neither criminality nor intentionality.
As FINR itself acknowledges, the court in Spradley does not purport to articulate a per se rule regarding the impermissibility of an expert opinion that a death was a homicide. Instead, Spradley must be understood as addressing a particular circumstancethe implication that a crime was committedrequiring exclusion of an expert opinion that a death was a homicide. This view concerning Spradley is consistent with case law that has recognized the appropriateness of expert testimony that a death was a homicide. See Lambrix v. State, 494 So.2d 1143, 1148 (Fla.1986) (rejecting argument that medical examiner's "use of the word `homicide' . . . constituted an expression of opinion as to appellant's guilt or innocence" and concluding that medical examiner "never expressed an opinion as to appellant's guilt or innocence nor can such an inference be drawn from his testimony"); Huck v. State, 881 So.2d 1137, 1150 (Fla. 5th DCA 2004) ("[W]e conclude that the trial court did not abuse its discretion in allowing the medical examiner to testify regarding the cause and manner of death [homicide] of the victim."); see also State v. Scott, 206 W.Va. 158, 522 S.E.2d 626, 632 (1999) ("Because the term `homicide' is neutral and pronounces no judgment, we do not find that [the medical examiner's] testifying that [the victim's] manner of death was *983 homicide removed any defense available to [the defendant].").
In the instant caseunlike Spradley the context makes clear that the medical examiner's opinion that homicide was the manner of death did not imply that a crime had been committed. The possible misinterpretation of homicide by the jury was averted by this instruction to the jury: "The word homicide means death at the hands of another. It does not imply that any crime has been committed." The danger of misunderstanding was also remedied by the medical examiner's testimony explaining the meaning of homicide. The medical examiner testified that the medical definition of "homicide" is "death at the hands of another." The medical examiner further testified he was not expressing an opinion that Lieux's death was manslaughter. He explained that in using the term "homicide," he was employing a "medical classification" and "not a legal classification." The medical examiner further explained that in making the medical classification of "homicide," he expressed no view concerning "the intent of the folks that had something to do with the person['s] dying."
The instruction to the jury and the medical examiner's testimony provided more than adequate protection from the danger that the term homicide might be misinterpreted by the jury as implying that a crime had been committed. See Hines v. State, 276 Ga. 491, 578 S.E.2d 868, 873-74 (2003) (holding that there was no reversible error in allowing medical examiner to testify that death was a homicide where the "medical examiner testified the [homicide] classification had nothing to do with the defendant's intent and meant only that `but for the actions of another individual' the decedent would not be dead").
The term homicide has an established meaningin common parlance, as well as in legal and medical usagethat neither denotes nor connotes criminality. The fact that some homicides are caused by criminal conduct and that the term homicide may be misunderstood does not justify precluding use of the termat least where the meaning of the term is made clear to the jury.
In weighing the probative value of the evidence against the potential for unfair prejudice, the trial court very reasonably concluded that the opinion evidence should not be excluded. The expert opinion of the medical examiner concerning the manner of deathestablishing that some human agency was involved in bringing about the deathhad significant probative value on the issue of negligence. Given the jury instruction and the medical examiner's testimony concerning the meaning of homicide, any potential for unfair prejudice, confusion of issues, or misleading the jury was negligible. In such circumstances, the trial court clearly did not abuse the discretion it exercised under section 90.403 in allowing the use of the term homicide.

2. Evidence Concerning the Opinion of Law Enforcement Authorities

In its initial brief, FINR argues that it should have been permitted to present the testimony of law enforcement officials that the death of Lieux was not a homicide. Although FINR proffered evidence that law enforcement officials had made no arrest and had concluded that no crime was committed in connection with Lieux's death, there was no proffer of evidence that the law enforcement authorities had determined that Lieux's death was not a homicide. As we have discussed above, concluding that a death was not caused by criminal conduct is not equivalent to concluding that the death was not a homicide. But since FINR has chosen to use homicide in the nonstandard sense of a death caused by a criminal act, we will address the merits of FINR's argument on this *984 point rather than treating the issue as unpreserved.
On its merits, FINR's argument is lacking. FINR cites no authority in support of its contention that the trial court should have permitted evidence that the law enforcement authorities who investigated the death of Lieux had determined that no criminal charges were warranted. The fact that no criminal charges were brought against FINR or its employees in connection with the death of Lieux is irrelevant to the plaintiffs' negligence claims against FINR. And the admission of the medical examiner's expert opinion concerning the manner of death in no way opened the door to introducing the opinion of law enforcement officials on the entirely different question of whether a crime had been committed.
The general rule is that evidence of a prior acquittal in a criminal case is inadmissible in a civil case in which the conduct underlying the criminal charge is at issue. See Wirt v. Fraser, 158 Fla. 777, 30 So.2d 174, 176 (1947) (holding in wrongful death case that "[t]here was no error in refusing [admission into evidence of] the verdict and judgment of acquittal in the criminal case where appellant was acquitted on a charge of murder growing out of this same homicide").[5] The opinion of law enforcement authorities concerning the innocence of the defendant in a civil case is similarly inadmissible. See Eggers v. Phillips Hardware Co., 88 So.2d 507, 508 (Fla. 1956) (holding in civil case that it was "error to allow the investigating officers to testify that they did not arrest the defendant"). Accordingly, the trial court did not abuse its discretion in excluding the opinion evidence of the law enforcement authorities.

Conclusion
The judgment against FINR is therefore affirmed.
Affirmed.
NORTHCUTT and KELLY, JJ., Concur.
NOTES
[1] See § 768.21(4), Fla. Stat. (2003) (providing under Wrongful Death Act that "[e]ach parent of an adult child may . . . recover for mental pain and suffering if there are no other survivors").
[2] Section 406.11(2)(a), Florida Statutes (2003), sets forth the authority of the medical examiner "to determine the identification of or cause or manner of death of the deceased or to obtain evidence necessary for forensic examination."
[3] It is not clear why FINR considered categorizing the death as an accident to be the key to its defense of the case. It is obvious that an accident may be caused by negligence. It appears that classification of the manner of death as natural would have been most consistent with FINR's contention that it was not negligent.
[4] Suicideunlike homicideis by definition intentional.
[5] An exception from the general rule is established by section 772.15, Florida Statutes, for civil actions brought under chapter 772, the Civil Remedies for Criminal Practice Act.