494 So.2d 1143 (1986)
Cary Michael LAMBRIX, Appellant,
v.
STATE of Florida, Appellee.
No. 65203.
Supreme Court of Florida.
September 25, 1986.
*1145 J.L. "Ray" LeGrande and Barbara LeGrande of LeGrande & LeGrande, Ft. Myers, for appellant.
Jim Smith, Atty. Gen., and James H. Dysart, Asst. Atty. Gen., Tampa, for appellee.
ADKINS, Justice.
Cary Lambrix appeals his conviction on two counts of first-degree murder and the imposition of two sentences of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm both convictions and sentences.
On the evening of February 5, 1983, Lambrix and Frances Smith, his roommate, went to a tavern where they met Clarence Moore, a/k/a Lawrence Lamberson, and Aleisha Bryant. Late that evening, they all ventured to Lambrix' trailer to eat spaghetti. Shortly after their arrival, Lambrix and Moore went outside. Lambrix returned about twenty minutes later and requested Bryant to go outside with him. About forty-five minutes later Lambrix returned alone. Smith testified that Lambrix was carrying a tire tool and had blood on his person and clothing. Lambrix told Smith that he killed both Bryant and Moore. He mentioned that he choked and stomped on Bryant and hit Moore over the head. Smith and Lambrix proceeded to eat spaghetti, wash up and bury the two bodies behind the trailer. After burying the bodies, Lambrix and Smith went back to the trailer to wash up. They then took Moore's Cadillac and disposed of the tire tool and Lambrix' bloody shirt in a nearby stream.
On Wednesday, February 8, 1983, Smith was arrested on an unrelated charge. Smith stayed in jail until Friday. On the following Monday, Smith contacted law enforcement officers and advised them of the burial.
A police investigation led to the discovery of the two buried bodies as well as the recovery of the tire iron and bloody shirt. A medical examiner testified that Moore died from multiple crushing blows to the head and Bryant died from manual strangulation. Additional evidence exists to support a finding that Lambrix committed the two murders in question.
In accordance with the jury's recommendation, the trial judge imposed two sentences of death on appellant, finding five aggravating and no mitigating circumstances in regard to the murder of Moore and four aggravating and no mitigating circumstances in regard to the murder of Bryant. Appellant now contends that numerous errors occurred during the guilt phase of the trial. We disagree.
Appellant's first contention on appeal concerns the constitutionality of death-qualified juries. Appellant asserts that the exclusion of jurors opposed to the death penalty results in juries that are not representative of the community and conviction prone. The Eighth Circuit accepted this argument in Grigsby v. Mabry, 758 F.2d 226 (8th Cir.1985). However, the United States Supreme Court recently overruled Grigsby, in Lockhart v. McCree, ___ U.S. ___ 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Further, this assertion has already been raised and rejected by this Court. Dougan v. State, 470 So.2d 697 (Fla. 1985). Once again, we reject this contention.
Appellant contends that the trial court erred in excluding juror Mary Hill for cause in violation of the standards set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The problem with appellant's argument is that the United States Supreme Court has recently rejected the standards set forth in Witherspoon. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court held that the proper standard for excluding jurors in death cases is the test enunciated in Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In Adams, the Court held that:
[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance *1146 with his instructions and his oath.
488 U.S. at 45, 100 S.Ct. at 2526.
Unlike the Witherspoon standard, the standard set forth in Witt to determine whether a prospective juror may be excluded for cause because of his or her views on capital punishment does not require that a juror's bias be proved with unmistakable clarity. Witt, 105 S.Ct. at 852.
The transcript of voir dire indicates that Mrs. Hill repeatedly waivered when questioned about her ability to vote in favor of the death penalty. The relevant voir dire testimony is as follows:
MR. GREENE (Prosecutor): Let's go to phase two. If you did in fact come back with a guilty of one or both counts of first degree murder, then we go to the penalty phase. At that point, the jury makes a recommendation to Judge Stanley as to life imprisonment or death penalty. Could you vote for the death penalty if you were convinced by the evidence and the instructions the Judge gave you?
MRS. HILL: No.
MR. GREENE: Under any circumstances, could you consider the death penalty?
MRS. HILL: I don't think so. Life imprisonment yes, but 
MR. GREENE: If you gave me an "if possible", I know it's hard for you to do. Could you give me a possibly as a definite answer, as possibly to yes or no? Could you, under any circumstances, vote for the death penalty?
MRS. HILL: No.
MR. GREENE: You would never consider the death penalty?
MRS. HILL: No, I could never.
MR. GREENE: Are you sure of that?
MRS. HILL: Yes. I worked with children too much. That's one of the reasons why I couldn't do it.
MR. GREENE: Your Honor, based on her answers, the State would ask that she be excused for cause.
THE COURT: You may inquire.
MR. JACOBS (Defense Attorney):
Ma'am do you feel that you could consider the guilt or innocence in this case if you were asked to decide whether my client was guilty or not guilty? Do you think you could do that?
MRS. HILL: Yes.
MR. JACOBS: Regardless of your views on the death penalty, you could do that?
MRS. HILL: Yes.
MR. JACOBS: Okay. Do you feel that after listening to Judge Stanley's instructions, you could follow the law, and consider  that's not saying you have to return a death recommendation  all the law requires is that you consider it?
MRS. HILL: Yes.
MR. JACOBS: You feel that you could consider it?
MRS. HILL: Yes.
Following a recess, the court questioned Mrs. Hill and the following transpired:
THE COURT: Mrs. Hill, having to do with the death penalty, under any circumstances, could you vote for the death penalty?
MRS. HILL: No.
THE COURT: Ma'am, you may step down for cause.
Mrs. Hill told the prosecutor that she could not consider the death penalty under any circumstances and told the defense attorney that she could follow the instructions of the judge and consider the death penalty. Both attorneys, being capable advocates, led Mrs. Hill's down the path of their choosing. Thus, the most pertinent portion of Mrs. Hill's voir dire testimony is her response to questions asked by the trial judge, the ultimate symbol of neutrality. The fact that Mrs. Hill told the trial judge that she could not vote for the death penalty under any circumstances is controlling.
The above quoted testimony indicates that Mrs. Hill's feelings concerning capital punishment would substantially impair her ability to act as an impartially juror. Further, we pay great deference to a trial judge's finding in this regard because, unlike a reviewing court, he is in a position to observe the juror's demeanor and credibility. Valle v. State, 474 So.2d 796 (Fla. 1985). Thus, the trial judge did not err in excluding Mrs. Hill for cause.
Appellant next argues that the trial court violated his sixth amendment right to confront *1147 witnesses by limiting his cross-examination of the state's key witness, Francis Smith. We disagree. As noted earlier, Francis Smith was with Lambrix on the night the murders occurred. Smith was arrested a few days after the murder on the charge of aiding and abetting a fugitive. The fugitive was Cary Lambrix, who had earlier escaped from state prison.
Ms. Smith's testimony at trial allegedly conflicted with a statement she made during her short period of incarceration. Defense counsel sought to bring out this inconsistency but was denied that opportunity when the court sustained an objection made by the state. At trial, in a proffered cross-examination outside the presence of the jury, defense counsel sought to bring out the inconsistency as follows:
MR. JACOBS (Defense Attorney): Miss Smith, have you made the statement to any police officer you were not with Cary Lambrix from the 1st to the 5th of February and that you did not see him until the 9th of February 1983?
MS. SMITH: I don't remember any statement like that.
MR. JACOBS: Judge, that's the only question I have. And I don't know for the record  I don't know where that opens any doors. I don't know where that would be considered opening any doors. That's why I want it proffered.
The statement defendant refers to was made by Smith to a police officer during her two-day incarceration. The "doors" that defense counsel refers to concern the state's ability to inquire into the details of Smith's arrest and allow the jury to find out that Lambrix was a fugitive.
The record reveals that defense counsel sought to ask one question and receive one answer. Counsel was trying to impeach the witness by way of a prior inconsistent statement without opening any doors that would be harmful to his case.
The question and answer proffered by defense counsel would, at best, enable the jury to raise an inference that perhaps the witness had made a prior inconsistent statement. Thus, although the proffered question may have been relevant, any probative value of the question and answer was clearly outweighed by the danger of misleading or confusing the jury by only hinting at and not establishing the inconsistency. § 90.403, Fla. Stat. (1983).
Obviously, defense counsel did not want to lay the proper predicate to impeach Ms. Smith. In order to properly impeach Ms. Smith, counsel would have to prove that she actually made the prior inconsistent statement. Counsel could do so by either producing the statement or eliciting testimony from the police officer to whom the statement had been made. Either of these methods would open the door and allow the state to introduce the circumstances surrounding Ms. Smith's incarceration. The question was only the first step in impeaching the witness and, standing alone, serves no purpose. Thus, we find that the trial court acted within its sound discretion in excluding the proffered question.
Appellant contends that the trial court erred in restricting the cross-examination of Connie Smith (no relation to Francis), a special agent with the Florida Department of Law Enforcement. Agent Smith participated in the crime scene investigation. On direct examination, Smith testified as to the location of the victim's bodies, what she observed inside appellant's trailer, and other details concerning the scene of the crime. On cross-examination, defense counsel sought to elicit information regarding a notebook found in Moore's vehicle and a picture found in Moore's wallet. On cross-examination proffered outside the presence of the jury, Agent Smith testified that the markings in the notebook were consistent with those of a drug smuggler and that the photograph was of a person who was a suspect in a RICO investigation. The trial court sustained the state's objection to these questions as "outside the scope of direct."
It is well established that questions on cross-examination must relate to credibility or matters brought out on direct examination. Pearce v. State, 93 Fla. 504, 112 So. 83 (1927). The court below properly *1148 denied cross-examination on these items as they were not testified to on direct and do not relate to credibility. Rather, appellant was improperly seeking to use cross-examination as a vehicle for presenting defensive evidence. Steinhorst v. State, 412 So.2d 332 (Fla. 1982). [22] Appellant contends that the trial court erred in allowing the medical examiner, Dr. Schultz, to use the term "homicide" in reference to the deaths of Moore and Bryant. Appellant asserts that such testimony was given without proper predicate.
Toward the beginning of his direct examination, Dr. Schultz testified that "[a]n autopsy is an examination ... to determine the cause of death as near as one can ... in either a natural setting or, in the case we are referring to, in a setting of post-homicide." Counsel objected to Dr. Schultz's reference to use of the word "homicide" on the ground that it constituted an expression of opinion as to appellant's guilt or innocence. We reject counsel's reasoning. Dr. Schultz never expressed an opinion as to appellant's guilt or innocence nor can such an inference be drawn from his testimony.
Appellant relies on Spradley v. State, 442 So.2d 1039 (Fla. 2d DCA 1983), in which the court found it error to allow a medical examiner to testify that a "homicide" had occurred to the exclusion of other possible causes of death when a sufficient predicate has not been laid. The record reveals that Dr. Schultz testified that the autopsies were performed "in a setting of post-homicide" before a proper predicate had been laid. However, unlike Spradley, in the instant case, Dr. Schultz followed the use of the term "homicide" with extensive testimony about the results of the autopsies and the facts he had relied upon to conclude that a homicide had occurred. In so doing, Dr. Schultz indicated that he had relied upon the type of material that experts in the field normally rely upon. We refuse to penalize the state merely because its expert jumped the gun and mentioned the word "homicide" before a sufficient factual predicate had been laid, when a sufficient factual predicate exists and is brought out during subsequent testimony. Further, in this instance, a sufficient factual predicate was laid before Dr. Schultz testified that Moore was "obviously the victim of a homicidal blow" and that Bryant died from manual strangulation after receiving two non-lethal blows. Thus, the trial judge did not abuse his discretion in overruling the state's objections to Dr. Schultz's testimony.
Appellant does not contest the trial judge's application of five aggravating and no mitigating circumstances to the murder of Moore, and four aggravating and no mitigating circumstances to the murder of Bryant. The five aggravating circumstances found by the trial judge are: (1) the capital felonies were committed by a person under sentence of imprisonment, section 921.141(5)(a), Florida Statutes (1983); (2) the defendant was previously convicted of another capital felony, section 921.141(5)(b); (3) the capital felony was committed for pecuniary gain, section 921.141(5)(f); (4) the capital felonies were especially heinous, atrocious or cruel, section 921.141(5)(h); and (5) the capital felonies were homicides and committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification, section 921.141(5)(i).
After a careful review of the record, we agree with the trial judge and all of the parties involved that five aggravating circumstances apply to the murder of Moore and four aggravating circumstances apply to the murder of Bryant. The circumstance that the murder was committed for pecuniary gain only applied to the murder of Moore because, following the murder, Lambrix stole Moore's automobile.
Accordingly, we affirm both of Lambrix' convictions and sentences.
It is so ordered.
McDONALD, C.J., and BOYD, OVERTON, EHRLICH and SHAW, JJ., concur.