PER CURIAM.
 

 Cary Michael Lambrix was convicted of two counts of first-degree murder and sentenced to death for the 1983 murders of Clarence Moore and Aleisha Bryant. This Court affirmed the convictions and sentences of death in
 
 Lambrix v. State,
 
 494 So.2d 1143 (Fla.1986). This case is now before the Court on appeal from an order denying a successive motion for postconviction relief. Among other claims raised, Lambrix asserted two claims that were the subject of an evidentiary hearing: that the main witness against him at trial, Frances Smith,
 
 [1]
 
 had a sexual relationship with one of the State’s investigators and that another witness, Deborah Hanzel, recanted her trial testimony. The trial court, following an evidentiary hearing on both of these issues, rejected the claim that Smith had a sexual relationship with an investigator and concluded that Hanzel’s recantation was unreliable. We affirm the trial court’s order denying postconviction relief as to these claims, as well as all other claims raised, for the reasons more fully explained in this opinion.
 

 GENERAL INTRODUCTION
 

 This death case, which has been in the judicial system for a substantial period of time, has a lengthy procedural history. The first trial ended in a mistrial after the jury could not agree on a verdict. A second trial was held before a different judge,
 
 *263
 
 Judge Richard M. Stanley, and the jury found Lambrix guilty of both counts of murder. After a penalty phase hearing, the jury recommended a sentence of death by a vote of ten to two for the murder of Aleisha Bryant and by a vote of eight to four for the murder of Clarence Moore. The trial court sentenced the defendant to death, after finding five aggravating circumstances
 
 [2]
 
 and no mitigation in regard to the murder of Moore and four aggravating
 
 [3]
 
 and no mitigating circumstances in regard to the murder of Bryant.
 

 On appeal, this Court discussed the relevant facts of the underlying crime:
 

 On the evening of February 5, 1983, Lambrix and Frances Smith, his roommate, went to a tavern where they met Clarence Moore, a/k/a Lawrence Lam-berson, and Aleisha Bryant. Late that evening, they all ventured to Lambrix’ trailer to eat spaghetti. Shortly after their arrival, Lambrix and Moore went outside. Lambrix returned about twenty minutes later and requested Bryant to go outside with him. About forty-five minutes later Lambrix returned alone. Smith testified that Lambrix was carrying a tire tool and had blood on his person and clothing. Lambrix told Smith that he killed both Bryant and Moore. He mentioned that he choked and stomped on Bryant and hit Moore over the head. Smith and Lambrix proceeded to eat spaghetti, wash up and bury the two bodies behind the trailer. After burying the bodies, Lambrix and Smith went back to the trailer to wash up. They then took Moore’s Cadillac and disposed of the tire tool and Lam-brix’ bloody shirt in a nearby stream,
 

 On Wednesday, February 8, 1983, Smith was arrested on an unrelated charge. Smith stayed in jail until Friday. On the following Monday, Smith contacted law enforcement officers' and advised them of the burial.
 

 A police investigation led to the discovery of the two buried bodies as well as the recovery of the tire iron and bloody shirt. A medical examiner testified that Moore died from multiple crushing blows to the'head and Bryant died from manual strangulation. Additional evidence exists to support a finding that Lambrix committed the two murders in question.
 

 Lambrix v. State,
 
 494 So.2d 1143, 1145 (Fla.1986). Some of the additional evidence included testimony by Deborah Hanzel, who met Lambrix after the murders and saw him in a black Cadillac. She and her boyfriend, Preston Branch, helped Lambrix retrieve some of his possessions from Lambrix’s trailer and on the way back home, Lambrix offered to show them where two bodies were buried and made incriminating statements.' On appeal, Lambrix raised five issues.
 
 [4]
 
 This Court
 
 *264
 
 affirmed the convictions and sentences of death. 494 So.2d at 1148.
 

 A death warrant for Lambrix was issued, and his execution was scheduled for November 30, 1988. Lambrix filed a motion for postconviction relief in the trial court and a petition for writ of habeas corpus in this Court. In his habeas petition, Lambrix asserted that his appellate counsel was ineffective in failing to argue numerous issues.
 
 [5]
 
 This Court denied habeas relief.
 
 See Lambrix v. Dugger,
 
 529 So.2d 1110 (Fla.1988). During this time, Lambrix’s motion for postconviction relief was also proceeding before the circuit court. After the circuit court summarily denied postconviction relief, Lambrix appealed this decision, raising two claims.
 
 [6]
 
 This Court denied relief.
 
 See Lambrix v. State,
 
 534 So.2d 1151 (Fla.1988). Lambrix then filed a second petition for writ of habeas corpus with the trial court, which was summarily denied. On appeal, Lam-brix raised one issue: that his collateral counsel was ineffective for failing to raise a claim of juror misconduct in his prior motion for postconviction relief. This Court again denied relief.
 
 Lambrix v. State,
 
 559 So.2d 1137 (Fla.1990). Lambrix also filed a second motion for postconviction relief in the circuit court, which was summarily denied because “his claims were without merit and procedurally barred as untimely and successive or abusive.”
 
 Lambrix v. State,
 
 698 So.2d 247, 248 (Fla.1996). In affirming the summary denial, this "Court concluded that Lambrix was untimely in presenting the claim that he should have been allowed to represent himself in post-conviction proceedings, particularly since Lambrix waited six years to raise this claim.
 
 Id.
 
 at 248.
 

 Lambrix also filed postconviction attacks in the federal courts. He filed a federal habeas petition, raising numerous claims including whether jury instructions on HAC and CCP violated
 
 Espinosa v. Florida,
 
 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992).
 
 See Lambrix v. Dugger,
 
 No. 88-12107-CIV-Zloch (S.D.Fla. May 12, 1992),
 
 aff’d sub nom. Lambrix v. Singletary,
 
 72 F.3d 1500 (11th Cir.1996),
 
 affd,
 
 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). Lambrix’s
 
 Espinosa
 
 claim was eventually denied.
 
 [7]
 

 
 *265
 
 As to the remaining issues, the Eleventh Circuit then affirmed the denial of relief of Lambrix’s federal habeas corpus petition after an evidentiary hearing.
 
 Lambrix v. Singletary,
 
 72 F.3d 1500 (11th Cir.1996). The Eleventh Circuit denied relief without further discussion as to certain claims.
 
 [8]
 
 After analysis, the Eleventh Circuit denied Lambrix’s claim that he received ineffective assistance during the sentencing phase of his trial because counsel failed to investigate and present mitigating evidence of Lambrix’s alcoholism and drug dependence and evidence that Lambrix had been subject to sexual and physical abuse as a child.
 
 Lambrix,
 
 72 F.3d at 1504-06. The Eleventh Circuit also denied Lambrix’s claim that appellate counsel rendered ineffective assistance by failing to present certain sentencing issues, that his second trial conducted after the first trial ended in mistrial was barred by double jeopardy, and that Lambrix was denied his fundamental right to testify.
 
 Id.
 
 at 1506-08.
 

 Lambrix has filed numerous pro se extraordinary writ petitions that this Court has either denied or dismissed.
 
 [9]
 
 During postconviction proceedings and before this Court, Lambrix also filed a pro se complaint against some of his attorneys. He also previously sought to have this entire Court disqualified because Chief Justice Quince' is recused. In his most recent filing, Lambrix filed a pro se civil rights action pursuant to 42 U.S.C. § 1983 against his attorneys, Governor Chárlie Crist, Clerk of Court Thomas Hall, Chief Justice Quince, and others, asserting that there is a conspiracy to deny meritorious claims against death penalty defendants. Counsel for Lambrix consequently filed a motion to withdraw, asserting that this action creates a conflict. Lambrix then filed a pro se motion waiving any potential conflict for the limited scope of permitting oral argument to continue. This Court denied counsel’s motion to withdraw.
 

 THE PRESENT PROCEEDINGS
 

 This current successive postconviction litigation was pending in the circuit court for a substantial period of time based on changes in judges, changes in counsel, and
 
 *266
 
 various amendments to the postconviction motion that occurred after counsel discovered new evidence. Ultimately, after several evidentiary hearings, the postconviction court denied relief on all of Lambrix’s claims. On appeal, Lambrix raises five issues: (1) whether the State withheld material exculpatory or impeachment evidence involving a sexual relationship between witness Frances Smith and State Attorney Investigator Robert Daniels in violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) whether an important witness (Deborah Hanzel) recanted her trial testimony; (3) whether the circuit court failed to allow a full and fair hearing; (4) whether there was judicial bias during the retrial proceedings; and (5) whether Lambrix is entitled to a new trial because he is actually innocent.
 
 [10]
 

 Alleged Sexual Relationship
 

 In his first claim, Lambrix alleges that the State suppressed evidence that would have impeached a key witness: Frances Smith. In support, he asserts that new evidence shows Smith had a sexual affair with State Attorney Investigator Robert Daniels and that she was given an undisclosed plea deal in exchange for her testimony. After an évidentiary hearing, the trial court determined that no sexual relationship between Smith and Daniels occurred and that there was no undisclosed plea deal.
 

 The two most important witnesses to this claim (Smith and Daniels) presented diametrically opposed testimony as to whether a sexual relationship ever occurred. Specifically, Smith testified at the evidentiary hearing that while Lambrix was being prosecuted, Smith had a “one-night stand” with the State Attorney’s investigator, Daniels, who also served as a pilot for the State Attorney’s Office. She asserted that she was not attracted to him, that it was not a romantic affair, and that she was “definitely not” proud of her behavior. She testified that after Daniels flew her down during one of her trips, he called her at her hotel room and asked her to join him in his hotel room. They were both probably drinking and had sex just the one time. She could not recall when the affair occurred, but it was during one of the trials against Lambrix — well after she first cooperated in the investigation and had already given numerous statements as to the events surrounding the crime. She did not tell anyone else about this incident and did not consider this to be an affair.or a relationship.
 

 Smith explicitly denied that anyone at the State Attorney’s Office asked her to change her story and denied that she modified her testimony against Lambrix after her sexual encounter. Smith acknowledged that she had no interest in seeing Lambrix released from prison or obtaining a new trial.
 

 Smith married Douglas Schwendeman about two years after the second trial concluded. Schwendeman also testified at the hearing, stating that Smith told him that during the trial proceedings, she had an affair with an investigator and pilot named Bob after they flew down and she stayed in his room. He did not tell anyone about this conversation until 2004.
 

 Investigator Daniels also testified. When he first met Smith, he was a little “jaundiced” about her because he believed she had some sort of involvement in the murder. Based on her cooperation, he and
 
 *267
 
 his current wife (who was an investigator with him at the time) were able to find the victims’ bodies. Daniels explicitly stated that he did not have sex with Smith and that he “certainly did not” ask her to change her testimony. During the second trial, he did stay at a hotel in Moore Haven, but did not recall staying at a hotel at any other time. He further provided and discussed his flight logs, which documented the times-that Daniels picked up Smith and other witnesses.
 

 The postconviction court found that no affair occurred, based on the following findings:
 

 —Frances Smith Ottinger
 

 Frances Smith, n.k.a. Frances Ottinger, was living with the Defendant at the time of the homicides. She was a witness for the State at both trials in 1983 and 1984. Her testimony at the trials and every recorded statement or deposition she has made in the past were received in evidence at the hearing.
 

 Ms. Ottinger testified that she had one sexual encounter with Mr. Daniels, although she cannot state where or when it occurred in relation to the pretrial investigation or either of the two trials. She does not know when it occurred. She testified that she remembered only that it happened in a hotel. When questioned about details of the encounter, Ms. Ottinger did not remember any significant facts. She repeatedly answered that she “does not recall,” “does not remember” or “does not know” about the time and place of the encounter. She could not state the name [of] the town in which the hotel was located.
 

 Ms. Smith answered each question slowly and deliberately. Her responses were sometimes halting. With nearly every answer that she gave, she paused for a significant time between the question and the answer. She related that she takes several medications for anxiety and depression.
 

 The Court has listened carefully to what Ms. Ottinger said and how she said it. The Court observed how she acted and the Court also heard what she said. Her testimony is not credible, when considered in light of all of the evidence.
 

 ■
 
 — Robert
 
 M. Daniels
 

 Robert Daniels also testified. Mr. Daniels was employed as an investigator with the State Attorney’s Office of the Twentieth Judicial Circuit from 1980 through 1994. He was also a pilot for that office during those years. Throughout his tenure, he maintained records of the flights he made. Copies of his flight logs were received in evidence. At the time of the prosecution of the Defendant, Mr. Daniels was á lead investigator, and his supervisor was William McQuinn. The Chief Investigator at the time of the Defendant’s prosecution was Ralph Cunningham, now deceased.
 

 Mr. Daniels testified that he first became involved in the case in 1983 after the State Attorney’s Office was notified by FDLE that it had Ms. Frances Smith, now Ottinger, in their custody and that she might be involved in the double homicide that is the subject of this case. After that notification, Mr. Daniels flew to Tampa and picked up FDLE Agent Connie Smith (no relation to Frances Smith), and Frances Smith’s brother. Mr. Daniels flew them to the Fort Myers area so that they could talk to the law enforcement officers .who were investigating the homicides.
 

 On cross-examination by the State, Mr. Daniels expressly denied any sexual relationship with Ms. Ottinger. Mr. Daniels was at all times forthright and direct. He did not evade the questions
 
 *268
 
 posed to him, and he answered each question promptly and without delay. He never wavered in his denial of a sexual encounter between himself and Ms. Ottinger. He said that he did not stay in a hotel during the pendency of the first trial, but during the second trial he did stay in a hotel in Moore Haven with the prosecution team.
 

 In addition, the State introduced into evidence copies of the flight logs maintained by Mr. Daniels throughout his tenure at the State Attorney’s Office. These records set forth the details of the flights Mr. Daniels made as a pilot while working for the State Attorney’s Office. The records tend to corroborate Mr. Daniels’s denial of a sexual encounter with Ms. Ottinger, although they do not negate the possibility of an encounter.
 

 —Doug Schwendeman
 

 The only other -witness with any knowledge that might bear upon the alleged sexual encounter between Ms. Ot-tinger and Mr. Daniels was Ms. Ottinger’s ex-husband, Doug Schwendeman. Mr. Schwendeman testified for the Defendant that he and Ms. Ottinger were married on May 81, 1986. He testified that Ms. Ottinger told him just prior to their marriage that she had one and perhaps two sexual encounters with a “pilot” named “Bob” at sometime during the prosecution of the Defendant.
 

 That testimony notwithstanding, both the State and defense stipulated, at pages 151, 152, and 158 of the transcript of the hearing of July 19 and 20, 2006, that Ms. Ottinger, if called to the stand again, would testify consistently with her deposition taken January 1, 2006. At that time she denied ever telling Mr. Schwendeman about the alleged sexual encounter with Mr. Daniels.
 

 The circumstances surrounding Mr. Schwendeman’s testimony about the admission of the encounter by Ms. Smith to Mr. Schwendeman are suspect. Mr. Schwendeman kept this information to himself for 18 years, from before May of 1986 until 2004. Ms. Ottinger and Mr. Schwendeman had a difficult divorce proceeding. Finally, Mr. Schwendeman admitted on cross-examination to having been convicted in 1998 of six counts of sexual abuse on Ms. Ottinger’s children, as well as domestic violence against Ms. Ottinger.
 

 The testimony of Mr. Schwendeman, offered to rebut a claim of recent fabrication by Ms. Ottinger, is unpersuasive and did not lend any clarity to the vagueness of Ms. Ottinger’s testimony.
 

 [[Image here]]
 

 The Court finds that Ms. Ottinger’s testimony is not credible and that Mr. Daniels’s testimony is credible. The testimony of Mr. Schwendeman is unpersuasive on the issue before the Court.
 

 The Court finds that the alleged sexual encounter between Ms. Ottinger and Mr. Daniels did not occur.
 

 As is clear from the trial court’s review of the testimony and its detailed order, the trial court carefully weighed the credibility of the witnesses, ultimately concluding that no sexual encounter between Frances Smith and Robert Daniels occurred. When the postconviction court rules after holding an evidentiary hearing, this Court “review[s] the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.”
 
 Green v. State,
 
 975 So.2d 1090, 1100 (Fla.2008). Appellate courts do not “reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses.”
 
 Nixon v. State, 2
 
 So.3d 137, 141 (Fla.2009) (quoting
 
 Brown v. State,
 
 959 So.2d 146, 149 (Fla.2007)). “[W]e review
 
 *269
 
 the trial court’s application of the law to the facts de novo.”
 
 Green,
 
 975 So.2d at 1100.
 

 We conclude that there is no basis in the record to reject the trial court’s factual finding that no sexual encounter occurred between Smith and Daniels. The trial court evaluated the substance of Smith’s testimony, concluding that Smith was vague as to when the alleged one-night relationship occurred and that her ex-husband’s testimony was not credible. The trial court provided its reasoning in detail. The court evaluated Daniels’ explicit denial of a sexual relationship and found his testimony in this regard was credible and consistent with the flight logs.
 

 However, even if the circuit court had accepted the testimony that a one-time sexual encounter had occurred, we would conclude that Lambrix cannot show prejudice, which is the third critical prong of a
 
 Brady
 
 claim. To meet the requirements of
 
 Brady,
 
 Lambrix must show that (1) favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.”
 
 Smith v. State,
 
 931 So.2d 790, 796 (Fla.2006) (citing
 
 Strickler,
 
 527 U.S. at 289, 296, 119 S.Ct. 1936). A reasonable probability is a probability sufficient to undermine our confidence in the outcome.
 
 See Way,
 
 760 So.2d at 913;
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936.
 

 An affair between the State’s key witness and the state' attorney investigator would be considered favorable evidence. Evidence as to a sexual affair between these witnesses could be used to impeach both Smith and Daniels, because it could be a basis as to why Daniels focused his investigation on Lambrix (as opposed to Smith, who was initially arrested while driving the victim’s car).
 

 However, Lambrix cannot demonstrate prejudice — that this suppressed evidence was sufficient to undermine confidence in the outcome. Specifically, the record established that the affair could have only occurred at one time — during the second trial, when they both had hotel rooms in the same hotel. Thus, even if the evidence about the affair had been admitted as proper impeachment, the State would have been able to present Smith’s prior statements and testimony, which were consistent with Smith’s testimony at the second trial, in order to rebut any allegation that her testimony was recently fabricated.
 
 [11]
 

 In fact, Smith’s testimony from the second trial was substantially similar to statements that she had made at the beginning of the investigation and to the testimony she provided in the first trial. Lambrix raises aspects of the testimony that he asserts represent a change in her testimony. After reviewing these alleged discrepancies, we find that any differences as to the specific details were minor and that these details did not change in any respect the key evidence she provided regarding the night of the crime, including Lambrix’s
 
 *270
 
 confession to her and her assistance in helping Lambrix to bury the bodies. Further, during the evidentiary hearing, Smith again affirmed her prior testimony and neither recanted nor changed her testimony inculpating Lambrix.
 

 Even if the subject of the alleged onetime affair could be the subject of cross-examination in an attempt to impeach Smith, there is no basis to conclude that the jury would have disregarded or not found credible the substantial testimony Smith provided as to the facts of the murders. Thus, Lambrix cannot establish the materiality prong of Brady — that confidence in the outcome is undermined.
 
 See Way,
 
 760 So.2d at 910.
 

 As another part of the
 
 Brady
 
 claim, Lambrix asserts that there was an undisclosed plea agreement between Smith and the State.
 
 [12]
 

 In the final order denying relief, the circuit court found:
 

 In addition, there is no evidence before this Court that the State in any way participated in the various improprieties that have been alleged throughout these postconviction proceedings. There is no evidence of a plea deal with Ms. Ottinger, nor is there any evidence that the State was aware of any misconduct on the part of one of its investigators. Of course it goes without saying that because the Court has found that no such misconduct occurred, it is plain that the jury would never have heard about it at the time this case was tried.
 

 There is competent, substantial evidence to support the finding that there was no undisclosed plea deal between the State and Smith, and accordingly we deny this aspect of the claim.
 

 Alleged Recantation of Deborah Hanzel
 

 In his second claim, Lambrix asserts that the postconviction court erred in failing to find that witness Deborah Hanzel recanted and that Smith and a state agent coerced her to lie. This claim is based on the newly discovered evidence of Hanzel’s recent testimony.
 

 Hanzel was one of the witnesses who testified at both the initial trial and the second trial as to certain incriminating statements that Lambrix allegedly made. Specifically, she met Lambrix with her boyfriend, Preston Branch, and saw Lam-brix drive a black Cadillac. Around February 12, 1988, she, Branch, and Lambrix drove to an abandoned trailer to help Lambrix gather some of his possessions. On the way back, Lambrix said that for $100, he could show her “where I killed two people and buried [them].” He later called her after a newspaper article stated that police were looking for Lambrix, and during that conversation, she asked him if it was true that he killed the victim for his car. Lambrix replied, “[T]hat was of the reason [sic].” Branch, who was with Lam-brix and Hanzel when the statements were made, corroborated Hanzel’s testimony.
 

 During successive postconvietion proceedings, Hanzel was deposed in 1998 and stated that Lambrix never admitted that he killed anyone, which contradicted her trial testimony. During an evidentiary hearing, Hanzel again testified that Lam-brix never stated that he killed two people and that she testified otherwise because police made her fearful of Lambrix. The trial court denied the claim, stating in pertinent part:
 

 The Court has reviewed the transcript of the sworn statement given by Debo
 
 *271
 
 rah Hanzel before trial, as well as the transcript of her. trial testimony. The Court compared those transcripts with the testimony given at this evidentiary hearing. Even when taken in the light most favorable to the Defendant, perhaps all that counsel has proven is that Ms. Hanzel does not now have a very good memory - of something that occurred nearly twenty years ago.
 

 For example, Ms. Hanzel recalls today that the Defendant told her about buried bodies, but she now asserts that he did not say anything about killing them. Ms. Hanzel also states that she does not now remember “the phone calls” she received from the Defendant after the crimes were committed (although she testified about them at trial). Ms. Han-zel does not, however, now deny that the calls were placed.
 

 In addition, Ms. Hanzel concedes that she remembers some things, but not others. She allowed that some statements she made which were recorded twenty years ago did not refresh her recollection, while at the same time asserting that she does not “recollect” that the Defendant confessed to the killings.
 

 Upon evaluation of the testimony of Ms. Hanzel (and the other two witnesses who testified at the hearing), it is apparent that perhaps the only thing Ms. Hanzel knows for certain at this' time is that twenty years ago she believed Mr. Lambrix killed two people and buried their bodies behind a trailer in Glades County, but now she does not.
 

 At no time during this proceeding did Ms. Hanzel repudiate her prior testimony or otherwise acknowledge that she did not tell the truth at any time she was placed under oath in 1983 or 1984.
 

 After the trial court denied the claim, but while the motion- for rehearing was pending, Hanzel wrote a letter to the court that stated Lambrix never threatened her; rather, the police and Smith convinced her that Lambrix was a threat. In the letter, she further asserted that Smith told Han-zel that if Hanzel would “back up” Smith that Lambrix admitted the murders, they would no longer need to worry about him. In her letter, she further stated that she did not tell the truth at the most recent evidentiary hearing,. Hanzel- followed the letter with an affidavit to the same effect. The postconviction court ordered a further evidentiary hearing based on Hanzel’s latest statements. At this hearing, Hanzel testified that’ Lambrix never told her that he killed Bryant or Moore. Moreover, Hanzel testified that Smith stated Lambrix attacked Moore after Moore “went nuts.”
 

 Lambrix also testified under oath at the evidentiary hearing to support Hanzel’s testimony regarding what Lambrix told Smith (that he had to hit the male victim after he “went nuts”). According to Lam-brix, he told Smith the following account: after he- invited both- victims outside, Bryant and Moore began to fight, .so Lam-brix attempted to leave. On his way back, he heard a scream, grabbed a tire iron, and ran back. He saw Moore straddling Bryant and tried to push him off. Moore attempted to “come at [him],” so he continued to swing the tire iron at Moore until he realized that Moore “was down.” He denied that he ever admitted to killing either victim on purpose.
 

 In its final order denying relief, the circuit court made the following .findings as to Hanzel’s credibility:
 

 With regard .to Deborah Hanzel, the Court is presented with a confused witness who made equivocating statements about testimony she gave with respect to a double homicide that occurred well over twenty years ago. As the Court previously ruled on July 9, 2003, Han-
 
 *272
 
 zel’s testimony never met the legal requirements for a recantation.
 

 The court then denied relief as follows:
 

 With regard to Claim II (the Hanzel recantation) the Court finds that there is no credible evidence to support the Defendant’s allegations. The Court stands by its ruling previously made on July 9, 2003, and nothing that the Court has heard since has caused it to reach a contrary conclusion. Claim II is, one [sic] again, DENIED.
 

 To set aside a conviction based on newly discovered evidence, Lambrix must meet two prongs: (1) the “asserted facts must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence;” and (2) “the newly discovered evidence must be of such nature that it would
 
 probably
 
 produce an acquittal on retrial.”
 
 Jones v. State,
 
 591 So.2d 911, 915-16 (Fla.1991) (emphasis in original). In determining whether.the evidence compels a new trial, the trial court must “consider all newly discovered evidence which would be admissible and must evaluate the weight of both the newly discovered evidence and the evidence. which was introduced at the trial.”
 
 Tompkins v. State,
 
 994 So.2d 1072, 1086 (Fla.2008) (internal quotation marks omitted) (quoting
 
 Jones,
 
 591 So.2d at 916),
 
 cert. denied,
 
 — U.S. —, 129 S.Ct. 1305, — L.Ed.2d — (2009). As newly discovered evidence pertains to a recent recantation, this Court has stated:
 

 Recantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial. In determining whether a new trial is warranted due to recantation of a witness’s testimony, a trial judge is to examine all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. “Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury.” Only when it appears that, on a new trial, the witness’s testimony will change to such an extent as to render probable a different verdict will a new trial be granted.
 

 Archer v. State,
 
 934 So.2d 1187, 1196 (Fla.2006) (quoting
 
 Armstrong v. State,
 
 642 So.2d 730 (Fla.1994)).
 

 As this Court has noted repeatedly, recanted testimony is “exceedingly unreliable.”
 
 Heath v. State,
 
 3 So.3d 1017, 1024 (Fla.2009);
 
 see also Kormondy v. State,
 
 983 So.2d 418, 438 (Fla.2007);
 
 Archer,
 
 934 So.2d at 1196. When reviewing a trial court’s determination relating to the credibility of a recantation, this Court is “highly deferential” to the trial court and will affirm the lower court’s determination so long as it is supported by competent, substantial evidence.
 
 Heath,
 
 3 So.3d at 1024.
 

 Having reviewed the full record and the postconviction court’s findings, we conclude that there is competent, substantial evidence for the court’s ruling. The statements that most strongly support Lam-brix’s recantation claim -were presented in Hanzel’s affidavit. However, when Hanzel was questioned about these statements at the second evidentiary hearing, she generally could not testify to those statements on her own and referred to the affidavit to “refresh” her recollection.
 

 Further, even if Hanzel had not testified at trial that Lambrix stated he killed two people, the recantation would not be of such a nature that it would “probably produce an acquittal on retrial.” Hanzel nev
 
 *273
 
 er recanted her testimony that Lambrix offered to show her where two bodies were buried. Even without Hanzel’s testimony, there would still be the testimony of Branch that he heard Lambrix make statements similar to those to which Hanzel testified.
 

 Moreover, Hanzel was not the main witness to testify against Lambrix. Even without her testimony, there would still be the testimony of Lambrix himself at this most recent evidentiary hearing that he struck one of the victims using a tire iron, although he denied that he intended to kill either victim. Further, there was other significant evidence at the trial that pointed to Lambrix as the perpetrator of these murders. This evidence included the following: Smith’s testimony regarding the murders and that Lambrix threatened her if she did not help him bury the bodies; Deputy Sheriff Ron Council’s testimony that he saw Lambrix and Smith with the victims on the night of the murders; John Chezum’s testimony that on February 6 around' 2:30 in the morning, Lambrix drove up in a car that resembled the victims’ car and asked to borrow a shovel; and the victims were found buried near the trailer in which Lambrix was living. For the reasons above, Lambrix is not entitled to relief on this claim.
 
 [13]
 

 Whether Lambrix
 
 Wins
 
 Given a Full and Fair Hearing
 

 In his third claim, Lambrix asserts that the postconviction court prevented Lambrix from presenting various witnesses who would have supported Hanzel’s recantation, thus denying him a full and fair evidentiary hearing. Specifically, Lambrix sought to have the following three categories of witnesses testify: (1) two forensic pathologists who would have explained the significance of the deficiencies that they found in Bryant’s autopsy; (2) an expert in police procedures and criminal investigations who would have discussed how an unbiased and objective investigation should have been conducted and how a sexual affair would have impacted an investigation; and (3) three additional witnesses who would have testified that the property where the murder occurred did not have a pond.
 

 None of the general testimony of the expert witnesses or the lay witnesses would have been relevant to either the
 
 Brady
 
 or newly discovered evidence claims in this case. Accordingly, because the trial court did not abuse its discretion in refusing to admit this testimony, we deny this claim.
 

 Alleged Judicial Bias
 

 The fourth and last issue we address is Lambrix’s claim that newly discovered evidence established that his trial judge was biased.
 
 [14]
 
 He based this claim
 
 *274
 
 on statements Judge Stanley made during a January 1997 evidentiary hearing in another death penalty case, which involved defendant Raleigh Porter. In that case, Judge Stanley overrode the jury’s recommendation of life and imposed a death sentence.
 
 Porter v. State,
 
 723 So.2d 191, 193 (Fla.1998). The defendant in
 
 Porter
 
 subsequently learned, through a variety of sources, including the Clerk of the Circuit Court of Glades County, that Judge Stanley had made statements indicating his predisposition to sentence that particular defendant to death, even before the jury made its recommendation.
 
 Id.
 
 at 194. This Court vacated the death sentence based on the statements of actual judicial bias and remanded for a new penalty phase before an impartial judge.
 
 Id.
 
 at 197.
 

 In this case, the defendant relies on specific statements Judge Stanley made during the
 
 Porter
 
 case, as well as testimony that Judge Stanley gave in that case pertaining to his general beliefs about the death penalty. The postconviction court summarily denied relief, holding in relevant part:
 

 [T]his claim is legally insufficient because the motion does not allege any evidence of judicial bias in this case. The defendant bases this claim on the decision of
 
 Porter v. State,
 
 723 So.2d 191 (Fla.1998) and the facts of judicial bias relied on by the supreme court in reaching its decision in that case. In this case, the state does not dispute any of the facts from the record in
 
 Porter.
 
 The trial judge in
 
 Porter
 
 was the same trial judge who tried this case. Porter was tried in November, 1978, and sentencing in that case was concluded in 1981 after the first sentencing order was reversed due to a procedural defect. This case was tried in February, 1984.
 

 In
 
 Porter,
 
 the defendant’s motion alleged evidence of judicial bias against Mr. Porter, that is, statements of the trial judge in March 1995 to newspaper reporters and the affidavit of the clerk of court dated that same month which told of a conversation between the clerk and the trial judge before or during Mr. Porter’s trial in 1978. Once these allegations were developed by discovery and an evidentiary hearing, the supreme court found evidence of actual bias against Mr. Porter.
 

 However, in this case, there is no evidence of bias against Mr. Lambrix alleged in the motion beyond the trial judge’s statements in the record in
 
 Porter
 
 to the effect that he favored the death penalty.
 
 Porter
 
 did not decide the trial judge was generally unable to be impartial in capital cases. Further, in
 
 Porter,
 
 the trial judge overrode the jury’s recommendation of the death penalty.
 

 We affirm this ruling. In Lambrix’s successive postconviction motion, Lambrix confines his argument to very limited portions of Judge Stanley’s testimony in the
 
 Porter
 
 evidentiary hearing. As the trial court pointed out, although some of the trial judge’s statements indicate that he favored the death penalty, Lambrix did not point to any specific statements that were directed to his case and did not point to any statements that Judge Stanley was predisposed in Lambrix’s case to impose the death penalty. His argument rests on the assumption that because there is evidence to show that Judge Stanley was predisposed to sentence Porter to death, he was therefore predisposed to sentence all defendants to death.
 

 We reject that argument. In
 
 Porter,
 
 we never held that the trial judge was unable to be impartial in all capital cases, but held
 
 *275
 
 only that Judge Stanley lacked the necessary impartiality as to the sentencing phase of Porter’s trial.
 
 Porter,
 
 723 So.2d at 198-99. This case does not involve a judicial override of a life recommendation or any statements attributable to Judge Stanley indicating a predisposition to sentence Lambrix to death. This Court has recognized that judicial misconduct in one case does not mean that courts must presume misconduct in all cases.
 
 See, e.g., Maharaj v. State, 778
 
 So.2d 944, 952 (Fla.2000). Accordingly, we deny this claim and hold that Lambrix is not entitled to relief.
 

 CONCLUSION
 

 Accordingly, we affirm the circuit court’s denial of Lambrix’s successive motion for postconviction relief.
 

 It is so ordered.
 

 PARIENTE, LEWIS, CANADY, POLSTON, LAJBARGA, and PERRY, JJ., concur.
 

 QUINCE, C.J., recused.
 

 [1]
 

 . Frances Smith has subsequently remarried and is currently known as Frances Ottinger. For purposes of this appeal, we refer to her as Smith.
 

 [2]
 

 .The trial judge found the following five aggravating circumstances: (1) the capital felonies were committed by a person under sentence of imprisonment; (2) the defendant was previously convicted of another capital felony; (3) the capital felony was committed for pecuniary gain; (4) the capital felonies were especially heinous, atrocious, or cruel (HAC); and (5) the capital felonies were committed in a cold, calculated, and premeditated manner without any pretense of moral- or legal justification (CCP).
 

 [3]
 

 . The trial judge found all of the same aggravating factors except that the capital felony was committed for pecuniary gain.
 

 [4]
 

 . Lambrix raised the following claims: (1) it was unconstitutional to exclude jurors opposed to the death penalty; (2) the trial court erred in excluding a certain juror because it violated the standards set forth in
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (3) the trial court erred by limiting his cross-examination of the State’s key witness, Frances Smith; (4) the trial court erred in restricting the cross-ex-
 
 *264
 
 animation of Connie Smith (no relation to Frances), a special agent with the Florida Department of Law Enforcement (FDLE), concerning a certain notebook found in a vehicle belonging to one of the victims; and (5) the trial court erred in allowing the medical examiner, Dr. Schultz, to use the term "homicide” in reference to the deaths of the victims because there was no proper predicate for that conclusion.
 

 [5]
 

 . This Court addressed only two of his claims in its written opinion; (1) whether appellate counsel was ineffective because he- failed to argue several issues regarding voir dire and the defendant's absence; and (2) whether appellate counsel was ineffective for not raising whether the trial judge erred in refusing to instruct the jury as to voluntary intoxication.
 

 [6]
 

 . Lambrix raised the following claims: (1) trial counsel was ineffective in failing to develop additional evidence that would have entitled Lambrix to jury instructions on voluntary intoxication; and (2) trial counsel was ineffective in not introducing evidence of Lambrix's alcoholism during the penalty phase.
 

 [7]
 

 .After the federal district court denied relief, Lambrix appealed to the United States Court of Appeals for the Eleventh Circuit. Because this Court had not been given an opportunity to address the substance of the
 
 Espinosa
 
 claim, the Eleventh Circuit stayed the proceedings and directed Lambrix to return to the Supreme Court of Florida to settle any unresolved issues regarding this claim.
 
 Lambrix v. Dugger,
 
 No. 92-4539 (11th Cir. Mar. 3, 1993). In
 
 Lambrix v. Singletary,
 
 641 So.2d 847 (Fla.1994), this Court held that Lambrix’s
 
 Espinosa
 
 cláim was procedurally barred because although it was raised before the trial court, appellate counsel failed to preserve the
 
 *265
 
 error on appeal. Further, this Court held that Lambrix was procedurally barred from asserting that appellate counsel was ineffective based on this failure since he had previously litigated other alleged instances of ineffective appellate counsel in prior habeas proceedings.
 
 Id.
 
 at 848. The Eleventh Circuit held that the decision in
 
 Espinosa
 
 could not retroactively apply under
 
 Teague v. Lane,
 
 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).
 
 See Lambrix
 
 v.
 
 Singletary,
 
 72 F.3d 1500, 1503 (11th Cir.1996). The Supreme Court of the United States granted certiorari and affirmed the Eleventh Circuit court’s decision, holding that
 
 Espinosa v. Florida
 
 was a new rule and the failure to apply this case retroactively could not be the basis for federal habeas relief.
 
 Lambrix v. Singletary,
 
 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).
 

 [8]
 

 . The Eleventh Circuit did not elaborate on the following claims, but simply denied them as meritless: (1) Lambrix’s counsel rendered ineffective assistance during the guilt phase; (2) the trial court erred in refusing to grant a change in venue; (3) the trial court denied Lambrix his right to confront witnesses against him by limiting the cross-examination of some witnesses; (4) the trial court erred by failing to give a jury instruction on voluntary intoxication; and (5) the trial court made miscellaneous erroneous rulings and instructions during sentencing.
 

 [9]
 

 .
 
 See, e.g., Lambrix v. Reese,
 
 705 So.2d 902 (Fla.1998) (denying petition for writ of mandamus);
 
 Lambrix v. State,
 
 727 So.2d 907 (Fla.1998) (denying petition for writ of prohibition);
 
 Lambrix v. State,
 
 766 So.2d 221 (Fla.2000) (unpublished order dismissing petition for writ of mandamus as moot);
 
 Lambrix v. State,
 
 900 So.2d 553 (Fla.2005) (unpublished order dismissing petition for writ of mandamus);
 
 Lambrix v. State,
 
 944 So.2d 345 (Fla.2006) (unpublished order dismissing petition for writ of mandamus).
 

 [10]
 

 . We reject without discussion Lambrix’s claim that he is entitled to relitigate whether he is innocent of the crime based on
 
 Schlup v. Delo,
 
 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Lambrix mischaracterizes the holding of
 
 Schlup,
 
 which does not provide a freestanding claim to relitigate claims that are procedurally barred.
 

 [11]
 

 .
 
 See
 
 § 90.801(2)(b), Fla. Stat. (2009) (providing that a statement is not hearsay "if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is ... [cjonsis-tent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of improper influence, motive, or recent fabrication”).
 

 [12]
 

 . In addition, Lambrix asserts that he was denied due process because the trial court limited his ability to call certain witnesses. This issue is also raised in claim 3 and is discussed there.
 

 [13]
 

 . As a part of this claim, Lambrix also raises numerous allegations about the "state intervention and misconduct.” He does not challenge any circuit court rulings, and to the extent that he raises those claims here as a basis for relief, he has waived such claims because he failed to secure a ruling by the court below on such matters.
 
 See, e.g., Jones v. State,
 
 998 So.2d 573, 581 (Fla.2008) (“To be preserved, the issue or legal argument must be raised and
 
 ruled on
 
 by the trial court.”).
 

 [14]
 

 . We summarily reject Lambrix’s claim that he was deprived of a full and fair hearing because Judge Stanley died before the circuit court permitted Lambrix to take a deposition of Judge Stanley. As another subclaim to this issue, Lambrix asserts that the trial court erred in failing to order either production or an in camera inspection as to his request for ' records from the Florida Parole Commission, which he had requested in order to review Judge Stanley’s comments concerning clemency for Lambrix in 1987, 1988, and 1994. We reject this claim because Lambrix failed
 
 *274
 
 to obtain a ruling on this motion.
 
 Rhodes v. State,
 
 986 So.2d 501, 513 (Fla.2008) (“To be preserved, the issue or legal argument must be raised
 
 and
 
 ruled on by the trial court.”).