DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

————————————————

SANDRA PEREZ CARBONELL,

Appellant,

v.

CITIZENS PROPERTY INSURANCE CORPORATION,

Appellee.

No. 2D22-495

————————————————

January 5, 2024

Appeal from the Circuit Court for Hillsborough County; Emily A. Peacock, Judge.

Jeremy D. Bailie of Weber, Crabb & Wein, P.A., St. Petersburg, for Appellant.

Edgardo Ferreyra and Daniel S. Weinger of Luks, Santaniello, Petrillo, Cohen & Peterfriend, Fort Lauderdale, for Appellee.

LaROSE, Judge.

   Citizens Property Insurance Corporation insured Sandra Perez Carbonell's house. A jury returned a verdict in favor of Citizens in a sinkhole case. It found that Ms. Carbonell's house suffered no structural damage caused by sinkhole activity. We have jurisdiction. *See* Fla. R. App. P. 9.030(b)(1)(A). She takes issue with evidentiary rulings made by the trial court. Because Ms. Carbonell has not shown that the trial court abused its discretion, we affirm.

## Background

Citizens issued an all-risk homeowner's insurance policy to Ms. Carbonell. The policy covered "sinkhole loss." The policy defined a "sinkhole loss" as "structural damage" caused by "sinkhole activity."

Ms. Carbonell reported possible sinkhole activity to Citizens. *See* § 627.706(2)(i), Fla. Stat. (2017) (" 'Sinkhole activity' means settlement or systematic weakening of the earth supporting the covered building only if the settlement or systematic weakening results from contemporaneous movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation."). Ms. Carbonell observed cracks in her driveway and noticed that the ground was sinking from the driveway leading to her front steps. She further recounted that

> the back door doesn't open. . . . And what was mentioned also about my washer/dryer. It's stackable, and it's leaning on the pantry, and it bangs and shakes sometimes against the pantry. There's cracked tiles in the front porch. The laminate that was put down after the tile was removed is separating. There's cracks on the walls, cracks in the driveway.

Citizens hired a forensic engineering firm to determine whether a sinkhole loss occurred. *See* § 627.706(2)(j) (" 'Sinkhole loss' means structural damage to the covered building, including the foundation, caused by sinkhole activity.").

The engineering firm found that the damage observed by Ms. Carbonell "was not structural damage as defined by Chapter 627.706 of the Florida Statute [sic]." *See* § 627.706(2)(k) (setting forth a five-part definition of "structural damage"). Accordingly, the engineering firm concluded that Ms. Carbonell's house did not sustain structural damage caused by sinkhole activity.

Citizens denied coverage. It explained that "[b]ecause [Ms. Carbonell's] home has not been structurally damaged, there is no Sinkhole Loss and no coverage available under [the] policy." Relying on the engineering firm's report, Citizens advised her that an alternative combination of factors caused the damage to the house, including "differential vertical movement," "material expansion," and "type and/or quality of construction methods."

Ms. Carbonell sued Citizens. She sought a declaration that sinkhole activity caused structural damage to her house and that her policy covered the damage.

We recount those portions of the three-day trial necessary to evaluate Ms. Carbonell's appellate arguments.

Ms. Carbonell called Barry Smith, a licensed professional engineer, as a witness. He testified that Ms. Carbonell's house suffered structural damage under two parts of the five-part statutory definition. *See* § 627.706(2)(k)1, 2. Mr. Smith concluded that the piers supporting the home experienced "vertical movement" and "the house itself [was] moving" downward into the soil:

> It certainly appeared that the foundation was significantly moving downward because the soils weren't holding the foundation adequately. So, the foundation was moving. That was allowing the next piece, which is these wood-frame girders and rim joists to move, that was allowing the floor joists to move and the overall condition resulted in the house itself moving.

*See* § 627.706(2)(k)2 (defining "structural damage" as including "[f]oundation displacement or deflection in excess of acceptable variances as defined in ACI 318-95 or the Florida Building Code, which results in settlement-related damage to the primary structural members or primary structural systems that prevents those members or systems from

3

supporting the loads and forces they were designed to support to the extent that stresses in those primary structural members or primary structural systems exceeds one and one-third the nominal strength allowed under the Florida Building Code for new buildings of similar structure, purpose, or location"). Mr. Smith explained that the house's floor was uneven, with portions experiencing "large scale sloping." Mr. Smith expressed concern that where sloping occurred near the foundation piers, the foundation was shifting due to "movement or settlement [of the] piers." *See* § 627.706(2)(k)1 (describing "structural damage" as including "[i]nterior floor displacement or deflection in excess of acceptable variances . . . which results in settlement-related damage to the interior such that the interior building structure or members become unfit for service or represents a safety hazard as defined within the Florida Building Code").

James Funderburk testified next for Ms. Carbonell. He is a licensed engineer and geologist. He testified that he found "damage or sinking." He described a "vertical process" in which ground movement (or settlement) caused foundation movement leading to damage of the house's supporting structures. He concluded that "sinkhole activity is the only peril or geological hazard present to account for settlement of the [home]."

John Edwards testified for Citizens. He is a licensed professional engineer. He testified about settlement of the foundation. Based on his multiple site inspections and review of competing engineering reports, he "conclu[ded] that there is no[ settlement damage] that [he] can identify." When discussing the photographs he had taken of Ms. Carbonell's house, Mr. Edwards testified that "all of this is just in great shape. . . . . [T]his is all in very good shape and not indicative of any settlement

4

damage that [he] could identify."  When asked whether the photographs and his review of "any data [he] had to look at" indicated settlement at Ms. Carbonell's home, Mr. Edwards testified:

> There's [sic] not signs of settlement due to the foundation giving way.  There's obviously—this could be considered settlement if we're talking about a floor, but this is not supported by the foundation or the piers that support the house.  So everything I saw relative to these piers and the girders that sit upon them are not settling to any degree that I can observe.

During cross-examination, Ms. Carbonell sought to elicit Mr. Edwards' opinion on sinkhole activity.  For instance, Ms. Carbonell queried Mr. Edwards as to whether "there's sinkhole activity in . . . Boring B-3?"  Citizens promptly objected, arguing that the question "[wa]s far outside the scope of what was asked on direct."  The trial court sustained the objection.  Further on cross-examination, Mr. Edwards attempted to decouple "settlement" and "structural damage."  He explained that the latter does not automatically follow the former:

> Q:  I mean, if there was evidence to you that the concrete piers had vertically moved downward, you would have to say there's settlement then at that point, right?
>
> A:  I would say there may be settlement.  That would be different than saying there's structural damage caused by settlement.  But, yeah, if I had seen a pier that is separated from the girder, I would say that it has settled.  Whether or not that qualified as structural damage would be another question.

Following Mr. Edwards' redirect examination by Citizens, Ms. Carbonell sought to recross Mr. Edwards about the presence of sinkhole activity.  In pertinent part, she argued:

> Yeah.  So, Your Honor, for the record, I'm going to ask for an opportunity to recross Mr. Edwards.  You know, what I tried to establish in my original cross is, you're a geotechnical guy, you're looking at the soils, you're trying to figure out if

5

the house settled, you admit that there's loose soils at the property.

    And I tried to get into, you know, sinkhole activity being a component of that, things you're going to look at. The data I tried to show him being a component of what he saw, and I wasn't allowed to get into that.

    And then Mr. Edwards just now started telling the jury that, yes, as part of his analysis he reviewed the SPT Borings. He specifically mentioned the SPT borings, which were the ones I tried to show him and wasn't allowed to. And he mentioned the soil densities, and he just talked about the soils that are supporting this house are—are fine and he doesn't see anything problematic. Well, now I should have the opportunity to show him something problematic.

Citizens retorted that it "never opened any type of door to sinkhole activity whatsoever. On cross-examination when I objected, he asked him whether there was sinkhole activity. That's what I objected to." Citizens explained that Mr. Edwards' direct examination concerned whether the house's foundation was properly supported considering the type and composition of soils around the foundation:

[D]uring the cross-examination [Ms. Carbonell] asked whether [Mr. Edwards] had considered any of the other soil conditions.

    So I made it clear that [Mr. Edwards] reviewed all of the data. He didn't provide any opinion whatsoever whether there's sinkhole activity or there's not sinkhole activity. What he said is: I reviewed all of the data, and I believe that the soils are—they can support the house, whatever and so on. We could have it read back.

    But we never talked about sinkhole activity. We never delved into the boring itself as to what it means, how do you interpret this, and if you see this, doesn't that mean this. None of that. Just did you review the data. I did. And you still believe that this soil—or these soils could support the home. I do.

        . . . .

6

So that's all he's working in, is whether or not this foundation system is properly supported. He's not here to talk about sinkhole activity, evaluate what's going on down below. I asked him about these soils around the foundation. We never left the foundation area.

. . . .

The mere fact that he said that he reviewed all of the data doesn't somehow negate that there was—that never any type of testimony whatsoever related to what the conclusions or what the sinkhole activity component of their case.

The trial court declined Ms. Carbonell's entreaty to recross-examine Mr. Edwards about sinkhole activity. It explained "that's just not been a part of any of the [direct-examination] testimony." The trial court allowed Ms. Carbonell to proffer Mr. Edwards' testimony.

Mr. Edwards' proffered testimony was unequivocal. Citizens never asked him to opine on the presence or absence of sinkhole activity. In fact, Mr. Edwards explained that he had no information to form such an opinion.

Following the proffer, the trial court remained steadfast: "He doesn't have an opinion. He's not comfortable. So I'm not going to let it go."

Citizens next called Tom Fisher, a structural engineer, to testify. Mr. Fisher detailed his structural analysis of Ms. Carbonell's house. He determined "that structural damage according to [section 627.706(2)(k)'s] definition was not occurring at the Carbonell residence." Citizens questioned Mr. Fisher about the cause of any damage to the home, and the remedy:

Q: To the extent that there is damage at the home, was it caused by something within the structure above the ground?

A: Yes. Everything that's associated with this is above ground.

7

Q: And do you believe that the fix that needs to be done at this house is something that can be done by just working on that flooring area above the ground?

A: Yes. The fix would be a very common procedure for this type of house.

On cross-examination, Mr. Fisher agreed that "there's been some damage to some structural components of th[e] home"; however, "[i]t's not related to anything below ground." The settlement he did see on the property did not affect the home itself, and "[t]he statutes require that I evaluate the house itself, the main structure."

Citizens rested its case after Mr. Fisher's testimony. Ms. Carbonell sought to present the deposition testimony of Robert Brown as rebuttal evidence:

I was planning on reading in the deposition of Robert Brown. Mr. Brown was the engineer from Envista that originally investigated this loss [for Citizens]. Mr. Brown's testimony and opinion is completely different than what Mr. Fisher just told this jury. He flat—he flat said the deviations in this floor elevation survey are the result of downward differential movement of the foundation pier system because of the soils not supporting it.

. . . .

So there were representations made by Citizens through the denial letters, and the reports, and information they sent her, that your home has settled. The foundation piers of your home have moved, and that has caused the damage to your house, but we're denying that because we don't pay for earth movement or sinking. They put that in the denial letter. It's an affirmative defense in the case, and it's contradictory to the evidence that they present here.

Among other things, Citizens responded that Mr. Brown's deposition testimony was cumulative. "[B]oth of [Ms. Carbonell's] experts have already testified that these . . . piers have either sank or settled or moved or whatever. So reading this in is, number one, cumulative." The trial

8

court agreed and prevented Ms. Carbonell from reading Mr. Brown's deposition into the record.

The jury returned a verdict for Citizens. On the interrogatory verdict form, the jury found that although Ms. Carbonell had proven that her house suffered a physical loss, Citizens demonstrated that her house suffered no structural damage.

## Discussion

### I. Evidentiary Rulings

Ms. Carbonell contends that the trial court made two erroneous evidentiary rulings that thwarted her ability to fully present her case. We review these claims for an abuse of discretion.[1] *See Knight v. GTE Fed. Credit Union*, 310 So. 3d 959, 961 (Fla. 2d DCA 2018) ("A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion."). "This standard of review affords the trial court considerable leeway . . . ." *Hassenplug v. Hassenplug*, 346 So. 3d 149, 152 (Fla. 2d DCA 2022) ("[I]f reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial [court] should be disturbed only when [its] decision fails to satisfy this test of reasonableness." (second and third alterations in original) (quoting *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980))).

---

[1] Following return of the jury's verdict, Ms. Carbonell filed a timely motion for new trial. *See* Fla. R. Civ. P. 1.530(b) ("A motion for new trial or for rehearing must be served not later than 15 days after the return of the verdict in a jury action . . . ."). In moving for a new trial, Ms. Carbonell made the same arguments that she now raises on appeal. We review the trial court's denial of a motion for new trial under the same abuse of discretion standard. *See Southwin, Inc. v. Verde*, 806 So. 2d 586, 587 (Fla. 3d DCA 2002).

(a)     Limited cross-examination of Mr. Edwards

Ms. Carbonell claims that the trial court improperly limited her cross-examination of Mr. Edwards. According to her, the trial court prevented her from soliciting his opinion about sinkhole activity at her house. She contends that Mr. Edwards' proffered testimony "was squarely within the parameters of his testimony on direct examination."

Ms. Carbonell tells us that "[t]he primary issue in this case is whether there is sinkhole activity at the property that caused structural damage to the property." She claims that "[p]reventing the jury from hearing about the presence of sinkhole activity significantly undercut [her] ability to rebut the testimony of Citizens' expert witnesses." This argument cannot win the day.

Insofar as Ms. Carbonell suggests that the jury heard no evidence that there was sinkhole activity at the house, the record reports the opposite. Ms. Carbonell's two experts testified that there was damaging sinkhole activity at the house.

During its direct examination of Mr. Edwards, Citizens never asked about sinkhole activity. Thus, Ms. Carbonell's attempt to cross-examine Mr. Edwards about sinkhole activity exceeded the scope of direct examination.

> Although a trial court possesses wide latitude in allowing cross-examination, such latitude is not without restrictions. Questions on cross-examination must relate either to credibility or to matters elicited on direct testimony. Cross-examination is not a vehicle to present defensive evidence. If a party wishes to place before the trier of fact testimony beyond the adverse witness' direct testimony, other than matters of credibility, the witness must be called in that party's case.

*Music v. Hebb*, 744 So. 2d 1169, 1171 (Fla. 2d DCA 1999) (citation omitted). If she wished to query Mr. Edwards on his opinion, she should have called him in her case. For whatever reason, she did not do so.

Critically, Ms. Carbonell failed to demonstrate that Mr. Edwards was qualified to offer an expert opinion about sinkhole activity. *See Chavez v. State*, 12 So. 3d 199, 205 (Fla. 2009) (observing that one of the preliminary determinations which must be made before admitting expert testimony is "whether the witness is adequately qualified to express an opinion on the matter"). During his proffer, Mr. Edwards unequivocally testified that Citizens never asked him to provide an opinion on sinkhole activity. He admitted that Citizens had not provided him with any information to formulate such an opinion. *See* Charles W. Ehrhardt, *Ehrhardt's Florida Evidence* § 702.1 (2023 ed.) ("A witness may only testify as an expert in the areas of his or her expertise. It is not enough that the witness is qualified in some general way. The witness must possess special knowledge about the discrete subject about which an opinion is expressed.").

Mr. Edwards had no basis upon which to opine about sinkhole activity at the house. *See* § 90.704, Fla. Stat. (2017) ("The facts or data upon which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial."); *Daniels v. State*, 4 So. 3d 745, 748 (Fla. 2d DCA 2009) ("An expert's opinion is admissible if it is 'based on valid underlying data which has a proper factual basis.' " (quoting *Carnival Corp. v. Stowers*, 834 So. 2d 386, 387 (Fla. 3d DCA 2003))). Consequently, the trial court properly excluded Mr. Edwards from opining on the presence or absence of sinkhole activity. *See, e.g., Lubkey v. Compuvac Sys., Inc.*, 857 So. 2d 966, 968 (Fla. 2d DCA 2003) (observing that in an attorney's fee hearing,

11

"[t]he expert's opinion, lacking any factual foundation, was not competent proof"); *Martin v. Story*, 97 So. 2d 343, 346–47 (Fla. 2d DCA 1957) (holding that opinion based on incomplete information was not admissible); *Dozier v. Hodges*, 849 So. 2d 1094, 1095 (Fla. 3d DCA 2003) (concluding that the trial court correctly excluded officer's estimate of speed even though the expert had been qualified as an expert because he had testified in his deposition that "he took no measurements, made no calculations, and had no factual basis for his opinion"); *Young-Chin v. City of Homestead*, 597 So. 2d 879, 882 (Fla. 3d DCA 1992) ("It has always been the rule that an expert opinion is inadmissible where it is apparent that the opinion is based on insufficient data." (quoting *Husky Indus., Inc. v. Black*, 434 So. 2d 988, 992 (Fla. 4th DCA 1983))); *cf. Jordan v. State*, 694 So. 2d 708, 715–17 (Fla. 1997) (holding that the trial court abused its discretion in allowing a witness to testify to matters beyond her area of expertise).

(b) Denial of rebuttal evidence from Robert Brown's deposition

Ms. Carbonell asserts that the trial court erroneously denied her request to offer Mr. Brown's deposition testimony. Ms. Carbonell asserts that Mr. Brown's deposition testimony was noncumulative and would have demonstrated the presence of sinkhole activity at her house.

In her initial brief, Ms. Carbonell tells us that

> [n]ot only did [her] retained expert[s] testify in support of her position . . . . But . . . Citizens' own expert[, Mr. Brown,], retained as required by Florida law, investigated the property, and determined there was downward movement of the soil under the driveway and under the foundation of the home that caused damage to the home.

In other words, Ms. Carbonell argues that although she presented evidence "in support of her position," she wanted Mr. Brown, "Citizen's own expert," to testify to the same. Tacitly, Ms. Carbonell concedes that

12

his deposition testimony would be cumulative.  *Cf. Gutierrez v. Vargas*, 239 So. 3d 615, 625 (Fla. 2018) ("While two proposed witnesses of the same medical specialty might indicate the possibility of cumulative evidence, the real question is whether they will testify to cumulative opinions based on the same facts." (emphasis omitted) (quoting *Delgardo v. Allstate Ins. Co.*, 731 So. 2d 11, 16 (Fla. 4th DCA 1999))).

Ms. Carbonell offered Mr. Brown's deposition to prove two points: (1) "that there was downward movement of the soil under the driveway and under the foundation of the home that caused damage to the home" and (2) that "the observed cracking in the interior wall and ceiling finishes . . . was the result of differential vertical movement of the underlying soil supporting [concrete masonry unit (CMU)] pier foundations."  Of course, her experts testified that "the foundation was significantly moving downward because the soils weren't holding the foundation adequately," and that there "was movement or settlement [of the] piers, I'm talking about moving downward into the – into the earth; so, vertical movement."  Contrary to Ms. Carbonell's position, the trial court did not prevent the jury from hearing that "there was downward movement of the soil under the driveway and under the foundation of the home that caused damage to the home."  *See Morgan v. State*, 415 So. 2d 6, 10–11 (Fla. 1982) ("When the court errs in disallowing certain evidence or a question or series of questions on cross examination but substantially the same matters sought to be presented or elicited are brought before the jury through other testimony of the same or another witness, the error is harmless.").

Seemingly, Ms. Carbonell wanted to argue to the jury that Citizen's *own* expert's conclusions supported her position.  Be that as it may, the trial court retains "broad discretion regarding the admissibility of

13

rebuttal testimony." *Castillo v. Bush*, 902 So. 2d 317, 324 (Fla. 5th DCA 2005). Indeed, "[t]rial courts have broad discretion to admit *rebuttal testimony*, and 'a trial court abuses that discretion when it limits *non-cumulative rebuttal* that goes to the heart of the principal defense.' " *Gutierrez*, 239 So. 3d at 626 (quoting *Mendez v. John Caddell Constr. Co.*, 700 So. 2d 439, 440–41 (Fla. 3d DCA 1997)).

On this record, we cannot say that the trial court abused its discretion in excluding Mr. Brown's cumulative rebuttal evidence. *See Canakaris*, 382 So. 2d at 1203.

II.     Harmful error

Ms. Carbonell maintains that "the exclusion of [the above-referenced] testimony was harmful" and a new trial should be granted. Essentially, she claims that the alleged errors were not harmless.

"An appellate court may 'set aside or reverse a judgment, or grant a new trial on the basis of [improperly] admitted or excluded evidence' only 'when a substantial right of the party [appealing] is adversely affected.' " *Fla. Inst. for Neurological Rehab., Inc. v. Marshall*, 943 So. 2d 976, 978-79 (Fla. 2d DCA 2006) (alterations in original) (quoting § 90.104(1), Fla. Stat. (2006)). However, having concluded that the trial court's evidentiary rulings were proper, there is no error, harmful or otherwise. *See Pelham v. Walker*, 135 So. 3d 1114, 1118 (Fla. 2d DCA 2013) (explaining that a trial court's erroneous evidentiary ruling "must be harmful in order to warrant reversal").

## Conclusion

We affirm the judgment in favor of Citizens.

Affirmed.


KHOUZAM and ROTHSTEIN-YOUAKIM, JJ., Concur.

14

————————————————————

Opinion subject to revision prior to official publication.